**UNITED STATES of America**

v.

**VEN–FUEL, INC.**

**No. 77–15–Cr–J–M.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Aug. 2, 1978.

John L. Briggs, U. S. Atty., M. D. Fla., Jacksonville, Fla., for the government.

Edward M. Booth, Arnold, Stratford & Booth, Jacksonville, Fla., Thomas R. McDade, Fulbright & Jaworski, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

This cause is before the Court for final judgment. The indictment initially alleged fifteen violations of federal law in connection with seven separate shipments of residual fuel oil introduced into the commerce of the United States. Counts two through eight of the indictment alleged that the defendant had introduced its residual fuel oil into United States commerce "by means of a false and fraudulent practice" in that it had made material misrepresentations in the course of its acquisition of a fuel oil import license from the United States Department of the Interior. Counts nine through fifteen alleged that, in connection with the same shipments and while operating under the same license, the defendant "willfully filed consumption entries" with federal customs officials pursuant to a license "which it had obtained by a false and fraudulent representation . . . whereby the United States was deprived of lawful duties on merchandise imported by" the defendant. Both groups of counts—two through eight and nine through fif-

teen—alleged violations of 18 U.S.C. § 542 (1976). Count one alleged that the defendant had conspired with one Jack Gusler, an unindicted co-conspirator, and with "unnamed and diverse other persons to the Grand Jury unknown", to commit the substantive offenses alleged in counts two through fifteen.

This case was first tried before a petit jury in late August, 1977. After lengthy deliberations, the jury announced that it would be unable to reach a unanimous verdict and, accordingly, the Court declared a mistrial and discharged the jury. Subsequently, through an order entered on September 23, 1977, the Court granted a defense motion for judgment of acquittal as to Count One of the indictment, the conspiracy count, leaving fourteen viable counts to be retried. Under a stipulation filed on October 20, 1977, the government and the defendant then agreed that the second trial of this case would be directed to the Court, sitting without a jury, and that for retrial purposes the record of the first trial would be submitted as a joint exhibit subject to any relevancy objections occasioned by the Court's entry of a judgment of acquittal on the conspiracy charge. Additionally, the parties agreed that each would be free to offer further testimony to supplement the record of the first trial. The Court heard this supplemental testimony on May 22 and 23, 1978, and, after hearing the final arguments of the respective parties, hereby enters its findings of fact and conclusions of law in this case.

## FINDINGS OF FACT

1. The defendant, Ven-Fuel, Inc., is a Delaware corporation that is owned jointly by Corporacion Venezolana del Petroleo (CVP), a Venezuelan Government Corporation, and ISC Development Corporation, a domestic corporation. The defendant is and was at all times material hereto engaged in the business of importing fuel oil into the commerce of the United States.

2. On March 14, 1973, the defendant applied to the United States Department of the Interior, Office of Oil and Gas, for an allocation and license for the importation of residual fuel oil into the United States. Specifically, the defendant applied for an allocation of one million barrels of residual fuel oil, to be imported during the period beginning April 1, 1973, and ending March 31, 1974.

3. At the time of the defendant's application for an import allocation, the pertinent eligibility criteria were set forth in Section 12 of Regulation One of the Department of Interior's Office of Oil and Gas, codified at 37A CFR 191 (1973). As it pertains to the circumstances of this case, that regulation required that, in order to be eligible for an import allocation, an applicant

> be in the business in District I of selling residual fuel oil to be used as fuel and have a throughput agreement (warehouse agreement) with a deepwater terminal operator under which agreement the person has delivered to the terminal residual fuel oil to be used as fuel which he owned when it was so delivered.

4. As defined by the Office of Oil and Gas, a "throughput agreement" was a type of storage arrangement providing for "the delivery to a deepwater terminal by a person of residual fuel oil which he owns and for a right in such person to withdraw on call an identical quantity of such oil from the terminal." Like the eligibility criteria previously noted, this definition appeared in Section 12 of Regulation One, promulgated by the Office of Oil and Gas in 1973.

5. To qualify as a deepwater terminal operator within the meaning of the Office of Oil and Gas regulations, an oil storage facility was required to have certain loading and storage capabilities delineated in Section 22 of Regulation One. Since Southland Oil Company possessed these capabilities at its tank farm in Savannah, it was a deepwater terminal operator under the previously mentioned regulations.

6. At all times material hereto, both Savannah, Georgia, and Jacksonville, Florida, were in District I for the purposes of the oil import allocations regulated by the Office of Oil and Gas.

7. Even though Section 12 of Regulation One on its face required that a potential importer already "be in the business" of selling fuel oil in District I and already have a throughput agreement under which the applicant "has delivered" oil to a deepwater terminal in the past, this regulation was not applied literally by the Office of Oil and Gas. Due to the severity of the fuel shortage existing in this country at the time, a determination was made to allow new importers to enter the domestic market under the allocation system as well. Thus, as it related to throughput agreements, the applicable regulation required only that an applicant have a binding throughput agreement for the storage of the applicant's oil once the applicant began importing fuel oil into District I.

8. Beginning in the latter part of 1972, representatives of the defendant began discussions with Savannah Electric and Power Company (SEPCO), a utility that employed (inter alia) residual fuel oil in generating electricity, regarding the possible sale of residual fuel oil to SEPCO by the defendant. At the time, SEPCO was contractually obligated to purchase oil from other sources, and the defendant was aware of that fact. The defendant was interested, however, in operating as a "second source" for SEPCO, to provide fuel oil that might be needed in excess of the minimum quantities that SEPCO was obligated to purchase from its first source.

9. Shortly thereafter, the defendant commenced discussions with Southland Oil Company, a deepwater terminal operator in Savannah, Georgia, in connection with the possible storage of residual fuel oil imported by the defendant·and earmarked for sale to SEPCO. At approximately the same time, the defendant also explored the possibilities and costs of transporting its residual fuel oil by barge from Southland's terminal to SEPCO's facilities. All these negotiations were still under way in early 1973, and there was in fact never a firm contract between the defendant and SEPCO for the sale of residual fuel oil.

10. Although Southland qualified as a deepwater terminal operator under the applicable regulations, it had never handled the storage of residual fuel oil prior to its negotiations with the defendant. Because of its viscosity, residual fuel oil differs from other oils in that it must be heated in order to be properly handled. At the ·time of the negotiations with the defendant, Southland's tank farm had only a few tanks with this capability, and these tanks were already committed to the use of other parties. Southland estimated that adapting a sufficient number of its tanks to the storage of the defendant's residual fuel oil would require twelve weeks of construction work and an expenditure of some $175,000.

11. When the defendant applied to the Office of Oil and Gas for its· import allocation, in March of 1973, it had not reached a final agreement with SEPCO regarding the purchase of residual fuel oil. In fact, the defendant made no specific representation to the Office of Oil and Gas that a binding contract did exist between it and SEPCO. However, the defendant had reached an agreement with Southland for the possible storage of its residual fuel oil. This agreement between the defendant and Southland was embodied in two documents. The defendant submitted one of these documents to the Office of Oil and Gas in support of its allocation application; it did not submit the second document in that connection.

12. The document tendered by the defendant in support of its application was a letter from Southland to the defendant dated March 21, 1973, outlining the terms of the Southland/Ven-Fuel agreement. That letter (Government's Exhibit 19a) read as follows:

Ven-Fuel, Inc.
Suite 440
2121 Ponce de Leon Boulevard
Coral Gables, Florida 33134
Attention: Mr. Julio C. Iglesias,
President
Dear Mr. Iglesias:
With reference to our conversations in regard to the storage and handling of residual fuel for your account at our ter-

minal facilities located at the Port of Savannah, we submit the following proposal.

We will provide for your exclusive use two 80,000 barrel tanks and one 55,000 barrel tank for the purpose of storing and handling of residual fuel for your account. Southland will receive, store and ship on your order residual fuel at the prevailing commercial rates on a basis of a minimum of four turnovers per twelve month period. The contract will run for twelve months from the date of acceptance and will be automatically renewed unless ninety days notice is given by either party prior to the anniversary date.

This contract will go into effect as soon as the tanks have been inspected as suitable for handling your commodity and the proper equipment is installed for heating and pumping.

This agreement can be cancelled by either party by giving the other thirty days notice prior to the letting of the contract for the additional equipment required for the handling of the residual fuel.

Under the terms of this agreement the title to the product will remain in Ven-Fuel at all times and any insurance, if desired, will be at the expense of Ven-Fuel.

Please indicate your acceptance of this proposal by signing one copy of this letter and returning it to us.

> Cordially,
> SOUTHLAND OIL COMPANY
> /s/ N. S. McGee
> President

Accepted:
VEN–FUEL, INC.
/s/ Julio C. Iglesias
President

This letter was signed by both Mr. McGee for Southland and Mr. Iglesias for Ven-Fuel.

In addition to this March 21 letter, the defendant submitted to the Office of Oil and Gas a letter from SEPCO to Southland that indicated that SEPCO was likely to be available as a customer for the defendant's fuel oil. That letter, also dated March 21, 1973, read as follows:

> Mr. Norman A. McGee
> Southland Oil Company
> P. O. Box 7085
> Savannah, Georgia 31408
> Dear Norman:
>
> The last time Julio Iglesias was in town, I promised to give you some information with regard to our # 6 requirements. The "wild blue yonder thinking" figures are below and I expect the stated quantity to increase each year.
>
> Our contract year with Humble covers the period July 1 to July 1 so it seems to me that the cleanest way is for you to plan to start making deliveries at the beginning of the contract year. In the year July '73 and July '74, I anticipate that we will require from a second source of supply approximately 750,000 barrels of # 6. It must be compatible with the oil that is being furnished by Colonial and a couple of fuel oil analyses are attached for your information. I am also attaching a copy of Humble's control specifications, but the last letter I had from them referred to the oil as 2.5 percent sulfur rather than 2.9 percent.
>
> I hope this gives Julio the information in which he was interested and will wait to hear further from you.
>
> > Yours very truly,
> > /s/ W. C. Smith
> > W. C. SMITH
> > Vice-President Operations

13. The letter that the defendant did not submit to the Office of Oil and Gas was written by the president of the defendant to Southland. It was apparently the transmittal letter that accompanied the defendant's signed return of the March 21 document (Government's 19a) written by Mr. McGee and eventually submitted to the Office of Oil and Gas. The unsubmitted, transmittal letter (Government's Exhibit 19c) was dated March 22, 1973, and read as follows:

> N. A. McGee, President
> Southland Oil Company
> P. O. Box 7058
> Savannah, Georgia 31408

Dear Norman,

Attached is a signed copy of our through-put agreement on residual fuel oil for your files. We hope this agreement will permit issuance of an import liscense [*sic*].

I am signing this agreement subject to your acceptance of the following under-standing. That, the agreement will not be put into operation prior to completing our negotiations with Savannah Electric later this year.

We understand your tanks are held by U.S. Government until May 31, 1973. Unless release earlier. There is no need to release these until an agreement is reached with Savannah Electric. Also, installation of additional equipment is re-quired to use these tanks for residual fuel oil. Ven-Fuel will be given sufficient notice in advance of equipment purchase to excercise [*sic*] the 30 day agreement cancellation option. And Ven-Fuel will not incurr [*sic*] any liability to, or become obligated to remit money to Southland Oil until we have reached an agreement with Savannah Electric. Please indicate your acceptance of this understanding.

> Yours Truly,
> VEN–FUEL, INC.
> /s/ J. C. Iglesias
> J. C. Iglesias
> President

Accepted
SOUTHLAND OIL CO.
/s/ N. A. McGee
N. A. McGee
President

Like the March 21 letter, this second letter was signed by both the defendant and Southland.

14. The two letters exchanged by the defendant and Southland materially differ in that the March 22 letter (Government's 19c), which was never submitted to the Office of Oil and Gas, clearly indicated the contingent nature of the defendant's throughput agreement with Southland and the uncertainty surrounding the defend-ant's sales contract with SEPCO. Although the March 21 letter (Government's 19a),

which was submitted, did contain a 30-day cancellation clause, the documents sub-mitted (taken together) indicated that these matters were much more clearly resolved than they in fact were.

15. At the time it submitted its applica-tion to the Office of Oil and Gas, and the documents previously described, the defend-ant knew that it was not fully disclosing the circumstances that were relevant to the decision of the Office of Oil and Gas on whether to allow the defendant to import residual fuel oil in the quantity requested. Thus, the defendant knowingly misrepre-sented the state of affairs relevant to the agency's inquiry. Obviously, an economic motive existed for such a misrepresenta-tion. The inference of the defendant's knowledgability in this connection is fur-ther buttressed by the fact that, after the government had begun the investigation that eventually led to the instant case, rep-resentatives of the defendant travelled to Savannah to examine Southland's files and departed with only one document: the un-submitted March 22 letter from the defend-ant to Southland.

16. Pursuant to the defendant's applica-tion, the Office of Oil and Gas issued Im-port License No. R–19–007683 (Govern-ment's Exhibit 8) on March 29, 1973, autho-rizing the defendant to import into this country one million barrels of residual fuel oil during the period from April 1, 1973, to March 31, 1974.

17. Shortly after the defendant obtained its import license—on April 18, 1973—the government suspended the collection of duties on residual fuel oil imports and sub-stituted a system of license fees to be col-lected by the Department of the Interior. This change was promulgated by Presiden-tial Proclamation 4210, issued by President Nixon pursuant to his authority under the Trade Expansion Act of 1962, 19 U.S.C. §§ 1801 *et seq.* (1976). Under the new system, the defendant's authorization to im-port one million barrels of residual fuel oil operated to free it from the obligation to pay license fees on that fuel oil.

18. Some four months after the issuance of the import license to the defendant, SEPCO became unavailable as a buyer for residual fuel oil from the defendant. Of course, this made the defendant's "throughput agreement" with Southland meaningless. Subsequently, in August of 1973, the defendant began negotiating with the Jacksonville Electric Authority, Jacksonville, Florida, as a prospective buyer for the defendant's residual fuel oil.

19. The defendant and the Jacksonville Electric Authority came to terms, and, pursuant to that contract, the defendant entered residual fuel oil into the United States through the Port of Jacksonville, Florida, under the authority of its import license at the following times and in the following amounts:

| AMOUNT | ENTRY NO. | DATE OF ENTRY |
|---|---|---|
| 118,911 bbls. of residual fuel oil | J0508 | 10/13/73 |
| 119,824 bbls. of residual fuel oil | J0579 | 11/ 6/73 |
| 154,350 bbls. of residual fuel oil | J0578 | 11/ 6/73 |
| 184,070 bbls. of residual fuel oil | J0712 | 12/ 5/73 |
| 157,459 bbls. of residual fuel oil | J0740 | 12/ 7/73 |
| 148,293 bbls. of residual fuel oil | J0728 | 12/ 7/73 |
| 54,093 bbls. of residual fuel oil | J0861 | 1/11/74 |

## CONCLUSIONS OF LAW

Although both groups of counts—two through eight and nine through fifteen—allege violations of the same statute, 18 U.S.C. § 542 (1976), the two groups allege violations of different provisions of that statute. As a result, it seems advisable to address each group separately at this point.

A. *Counts Two through Eight*

■ To sustain a conviction, counts two through eight require the government to prove beyond a reasonable doubt that the defendant violated the first paragraph of 18 U.S.C. § 542 (1976), which provides in pertinent part that

whoever enters or introduces . . . into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement . . . or by means of any false or fraudulent practice . . . whether or not the United States shall or may be deprived of any lawful duties

shall be guilty of an offense against the United States. In the context of this case, the Court perceives four elements of this crime that the government must prove beyond a reasonable doubt: (1) that the defendant included in its application for an import license from the Office of Oil and Gas a false statement, viz., that it had a valid throughput agreement with a deepwater terminal operator, whereas, in fact, it did not; (2) that the defendant knew the falsity of its statement to the Office of Oil and Gas, and nevertheless willfully misstated the facts; (3) that the false statement contained in the defendant's license application was material in the context of the agency's determination of whether a license should be granted to the defendant; and (4) that by virtue of the import license obtained through the use of the false statement, the defendant introduced into the commerce of the United States residual fuel oil.

■ In the opinion of the Court, the government has proved each of these elements beyond a reasonable doubt. On the facts, items (3) and (4) offer little ground for dispute. Since the existence *vel non* of a valid throughput agreement was, by regulation, a dispositive factor in the decision of whether to issue a license, it is beyond dispute that a significant misrepresentation of the nature of the defendant's purported throughput agreement with Southland would be material to the agency's inquiry. As the Court's findings of fact indicate, there was a significant disparity between the terms of the throughput agreement tendered to the Office of Oil and Gas and the terms of the actual agreement between the defendant and Southland. Similarly, element (4) is not in dispute since, as the defendant admits, the residual fuel oil shipments alleged in the indictment were in fact made.

As to the first element, the Court believes that the defendant's misrepresentations constituted a "false statement" or a "false or fraudulent practice" within the meaning of the statute. In its application to the Office of Oil and Gas, signed by its vice-president, the defendant certified (*inter alia*) that (1) it was eligible for an allocation under Section 12 of Regulation One, discussed *supra*, and (2) it would need to import one million barrels of residual fuel oil to serve present and prospective customers in District I for the year from April 1973 through March 1974. To support point (1), it submitted the March 21 letter from Southland (Government's Exhibit 19a), outlining a throughput agreement, while withholding its own March 22 letter to Southland (Government's Exhibit 19c), which would have clarified for the agency the actual terms of that agreement; to support point (2), it submitted the letter from SEPCO to Southland (Government's Exhibit 7c), which indicated that negotiations between the defendant and SEPCO were proceeding smoothly and which would have left in any reasonable mind the expectation that the negotiations would in fact produce a contract between the parties. In the Court's judgment, neither document submitted presented an accurate picture of the facts of the matter; moreover, the one document that would have clarified matters—the March 22 letter—was withheld. This was, at least, a "false or fraudulent practice."

The only element remaining, then, is *scienter*. Although this is a circumstantial evidence case, the Court has to its own satisfaction ruled out every reasonable hypothesis of innocence. The most obvious hypothesis in this regard is that the defendant's actions were merely negligent and, for that reason, insufficient as a foundation for criminal culpability. Although the case is admittedly close, the Court is convinced that this defendant, through its agents, knew what it was doing. As indicated in the findings of fact *supra*, the economic motive was strong, and the actions of the defendant once the government began its investigation of this case were indicative of guilty knowledge. In the light of all the evidence in this case, and accounting for the demeanor of the witnesses for either side, the Court has no reasonable doubt that the defendant's actions were both knowing and willful. Accordingly, the Court will enter judgment against the defendant on counts two through eight of the indictment.

B. *Counts Nine through Fifteen*

▮ Counts nine through fifteen of the indictment allege that, in introducing the seven oil shipments in question into the Port of Jacksonville, the defendant consummated a violation of the second paragraph of 18 U.S.C. § 542, which provides in pertinent part:

> Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission

shall be guilty of an offense against the United States. There would appear to be four elements to this crime as well:

(1) That the defendant imported the residual fuel oil that is described in each count of the indictment into the Port of Jacksonville;

(2) that the defendant knowingly and willfully filed consumption entries with the Port Director of Customs, Jacksonville, Florida, using Import License R–19–007683;

(3) that Import License R–19–007683 had been obtained by means of a knowing and willful act or omission on the part of the defendant; and

(4) that the defendant by using said Import License R–19–007683, deprived the United States of lawful duties on the residual fuel oil so imported by the defendant.

As to the first three elements listed, the government met its burden of proof beyond a reasonable doubt, and the Court's findings and conclusions previously recounted adequately express the Court's views in this connection.

Element (4), however, is a different matter. As the Court noted in its findings of fact *supra*, President Nixon issued Presidential Proclamation 4210 on April 18, 1973, in which he suspended the collection of duties on imported petroleum and petroleum products, replacing the old tariff system with a new system of licenses and license fees. Thus, at the time the defendant's residual fuel oil shipments entered the Port of Jacksonville, there was no system of duties, as such, that the defendant was required to pay upon entry of its shipments. For that reason, the Court holds that the government has failed to prove an essential element of the crimes charged in counts nine through fifteen of the indictment, viz., that the defendant's actions deprived the United States of lawful duties imposed upon the importation of the defendant's residual fuel oil. Accordingly, the Court will enter judgment acquitting the defendant on counts nine through fifteen of the indictment.