UNITED STATES of America, Plaintiff-Appellee,

v.

VEN–FUEL, INC., Defendant-Appellant.

No. 78–5682.

United States Court of Appeals, Fifth Circuit.

Sept. 18, 1979.

---

Ursula Mancusi-Ungaro, Miami, Fla., Edward M. Booth, Jacksonville, Fla., for defendant-appellant.

Robert S. Yerkes, Asst. U. S. Atty., Jacksonville, Fla., John L. Briggs, Sp. Atty., Tampa, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, CLARK and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

*This case presents a vicious duel,*

*Between the U.S. of A. and defendant Ven-Fuel.*

*Seeking a license for oil importation,*

*Ven-Fuel submitted its application.*

*It failed to attach a relevant letter,*

*And none can deny, it should have known better.*

*Yet the only issue this case is about,*

*Is whether a crime was committed beyond reasonable doubt.*

*Ven-Fuel was convicted of fraudulent acts,*

*By the Trial Court's finding of adequate facts.*

*We think it likely that fraud took place,*

*But materiality was not shown in this case.*

*So while the Government will no doubt be annoyed,*

*We declare the conviction null and void.*

### The Procedural Background Is Easily Stated . . .

The appellant, Ven-Fuel, Inc.,[1] was charged with 15 violations of 18 U.S.C.A. § 542, which prohibits the importation of merchandise by means of a false statement or practice.[2] Counts II through VIII alleged that Ven-Fuel introduced seven shipments of residual fuel oil[3] into the United States while operating under an import license obtained by false statements to the Office of Oil and Gas, Department of the Interior (OOG). Counts IX through XV charged that in connection with these same seven shipments, Ven-Fuel deprived the United States of lawful duties. Count I alleged that Ven-Fuel conspired with Jack Gusler, then Vice-President of Ven-Fuel, and with "unnamed and diverse other persons to the Grand Jury unknown" to commit the substantive offenses alleged in Counts II through XV.

In late August of 1977, the case was tried before a jury. After lengthy deliberations, the jury informed the Court that it could not reach a unanimous verdict, and the Court declared a mistrial. Thereafter, the Court granted a motion for judgment of acquittal on the conspiracy count.[4]

On October 20, 1977, the United States and Ven-Fuel filed a stipulation providing that the case would be retried before the Court, sitting without a jury, and that the Court could consider evidence admitted in the first trial, as well as any additional evidence the parties wished to introduce.[5]

1. Ven-Fuel is a Delaware corporation owned jointly by Corporacion Venezolana del Petroleo, a Venezuelan government corporation, and ISC Development Corporation, a domestic corporation based in Houston, Texas.

2. Section 542 provides in pertinent part:

   Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties; or

   Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission—

   Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

3. Residual fuel oil has unique characteristics and requires special methods of receipt, storage, and transportation.

4. With respect to Ven-Fuel's alleged conspiracy with Jack Gusler, the Trial Court held that a corporation cannot conspire with one of its officers. With respect to the unnamed co-conspirators, the Court found the evidence insufficient to support a conspiracy conviction.

5. Of course, the Trial Court was not to rely on any evidence from the first trial relating to the conspiracy charge.

At the completion of the second trial, the Court entered its findings of fact and conclusions of law.[6] Ven-Fuel was found guilty of Counts II through VIII and was acquitted on Counts IX through XV.[7]

Ven-Fuel now appeals its convictions (Counts II through VIII) on a variety of grounds.[8] Since we believe that Ven-Fuel's alleged fraudulent statements are immaterial as a matter of law, we reverse the conviction without reaching Ven-Fuel's other challenges.

### But The Facts Are Far More Complicated.

On March 14, 1973, Ven-Fuel applied to OOG for an allocation and license to import one million barrels of residual fuel oil into District I.[9] According to Department of Interior regulations, Ven-Fuel was required to demonstrate (1) that it was already in the business of selling residual fuel oil, and (2) that it had "a throughput agreement with a deepwater terminal operator under which agreement the person has delivered to the terminal residual fuel oil to be used as fuel which he owned when it was so delivered."[10] The regulations defined a "throughput agreement" as a storage arrangement providing for "the delivery to a deepwater terminal by a person of residual fuel oil which he owned and for a right in such person to withdraw on call an identical quantity of such oil from the terminal."[11]

Despite the literal requirements of the regulations, OOG required only that a license applicant have a binding throughput agreement. Thus, Ven-Fuel did not have to demonstrate that it was already in the business of selling fuel or that it had previously delivered oil to a deepwater terminal under a throughput agreement.

The Government contends that Ven-Fuel violated 18 U.S.C.A. § 542 in that Ven-Fuel falsely represented that it had a throughput agreement with Southland Oil Company, a deepwater terminal operator located in Savannah, Georgia.[12] Ven-Fuel did not reveal to OOG that its agreement with Southland was to go into effect only if Ven-Fuel succeeded in reaching a contract with Savannah Electric and Power Company (SEPCO) for the sale of residual fuel oil. SEPCO, a utility, used residual fuel oil to generate electricity. Although SEPCO was then committed to purchase oil from another company, Ven-Fuel's negotiations with SEPCO were premised on the idea that Ven-Fuel could serve as a "second source" of oil for purchases in addition to the amount SEPCO had already contracted to buy.

At the time Ven-Fuel applied for its license, SEPCO and Ven-Fuel had not even come close to reaching an agreement. Indeed, Ven-Fuel and SEPCO never reached an agreement (and the Southland/Ven-Fuel "agreement" thereby became a nullity).

---

**6.** See *United States v. Ven-Fuel, Inc.*, M.D.Fla., 1978, 454 F.Supp. 875.

**7.** In acquitting Ven-Fuel on Counts IX through XV, the Trial Court found that no duties were required upon the entry of merchandise at the time Ven-Fuel made its seven shipments, since President Nixon had suspended collection of duties on imported oil products.

**8.** Ven-Fuel claims, among other things, that the Government failed to prove that Ven-Fuel knowingly made a false representation, that the Government failed to prove that the alleged false representation was material, and that there was a fatal variance between the charge in the indictment and the evidence adduced at trial.

**9.** District I includes nearly every state with a port on the East Coast of the United States.

**10.** 32A CFR Ch. X § 12(b)(2) (1973). Alternatively, a company could obtain a license by showing that it was in the business of selling residual fuel oil and had management and operational control of a deepwater terminal in District I into which residual fuel had been delivered. 32A CFR Ch. X § 12(b)(1) (1973).

**11.** To qualify as a "deepwater terminal operator," the storage company was required to have special loading and storage capabilities set forth in the regulations.

**12.** While the Government attempted to demonstrate at trial that Southland was not a deepwater terminal operator, the Trial Court found that Southland qualified as such under applicable regulations. 454 F.Supp. at 878.

After obtaining the import license from OOG,[13] Ven-Fuel entered into an agreement with Jacksonville Electric Authority for the sale of the oil authorized by the license. The Jacksonville Electric Authority/Ven-Fuel contract price was higher than SEPCO was willing to pay,[14] a fact which the Government claims indicated that Ven-Fuel wished to acquire the license and then hunt for the highest paying buyer for the oil. Ven-Fuel proceeded to make seven shipments of oil to Jacksonville Electric Authority through the Port of Jacksonville. Jacksonville Electric had the necessary unloading and storage facilities to receive and store the oil. Ven-Fuel did not have, or even claim to have had, a throughput terminal in Jacksonville.

Ven-Fuel's disclosures and nondisclosures during the license application process were critical to the Trial Court's determination that Ven-Fuel was guilty of criminal activity. In support of its application for a license, Ven-Fuel submitted to OOG a letter it had received from Southland describing the agreement between the two companies. The letter, which was sent by Southland to Ven-Fuel's President on March 21, 1973 [the March 21 letter], stated:

> With reference to our conversations in regard to the storage and handling of residual fuel for your account at our terminal facilities located at the Port of Savannah, we submit the following proposal.
>
> We will provide for your exclusive use two 80,000 barrel tanks and one 55,000 barrel tank for the purpose of storing and handling of residual fuel for your account. Southland will receive, store and ship on your order residual fuel at the prevailing commercial rates on a basis of a minimum of four turnovers per twelve month period. The contract will run for twelve months from the date of acceptance and will be automatically renewed unless ninety days notice is given by either party prior to the anniversary date.
>
> This contract will go into effect as soon as the tanks have been inspected as suitable for handling your commodity and the proper equipment is installed for heating and pumping.
>
> This agreement can be cancelled by either party by giving the other thirty days notice prior to the letting of the contract for the additional equipment required for the handling of the residual fuel.
>
> Under the terms of this agreement the title to the product will remain in Ven-Fuel at all times and any insurance, if desired, will be at the expense of Ven-Fuel.
>
> Please indicate your acceptance of this proposal by signing one copy of this letter and returning it to us.

Ven-Fuel also submitted a letter from SEPCO to Southland [the SEPCO/Southland letter] which suggested that SEPCO would most likely need a second source of oil. That letter, which was also dated March 21, read:

> The last time Julio Iglesias [President of Ven-Fuel] was in town, I promised to give you some information with regard to our # 6 [residual fuel oil] requirements. The "wild blue yonder thinking" figures are below and I expect the stated quantity to increase each year.
>
> Our contract year with Humble covers the period July 1 to July 1 so it seems to me that the cleanest way is for you to plan to start making deliveries at the beginning of the contract year. In the year July '73 and July '74, I anticipate that we will require from a second source of supply approximately 750,000 barrels of # 6. It must be compatible with the oil that is being furnished by Colonial and

---

**13.** Ven-Fuel's license, No. R–19–007683, was issued on March 29, 1973. The license allowed Ven-Fuel to import one million barrels of residual fuel into District I between April 1973 and March 1974.

**14.** SEPCO had previously rejected an offer by Ven-Fuel for the sale of the residual fuel oil. SEPCO claimed it could obtain the oil elsewhere at a lower price. Additionally, two of SEPCO's generators were not functioning properly, thus reducing SEPCO's demand for residual fuel oil.

a couple of fuel oil analyses are attached for your information. I am also attaching a copy of Humble's control specifications, but the last letter I had from them referred to the oil as 2.5 percent sulfur rather than 2.9 percent.

I hope this gives Julio the information in which he was interested and will wait to hear further from you.

The crucial letter for purposes of this case is the one Ven-Fuel did not disclose to OOG. That letter, dated March 22, 1973 [the March 22 letter], made clear the conditional nature of the throughput agreement and specifically limited Ven-Fuel's liability to Southland. That letter, which was sent by Ven-Fuel to Southland, read:

Attached is a signed copy of our throughput agreement on residual fuel oil for your files. We hope this agreement will permit issuance of an import liscense [*sic*].

I am signing this agreement subject to your acceptance of the following understanding. That, the agreement will not be put into operation prior to completing our negotiations with Savannah Electric later this year.

We understand your tanks are held by U.S. Government until May 31, 1973. Unless release earlier. There is no need to release these until an agreement is reached with Savannah Electric. Also, installation of additional equipment is required to use these tanks for residual fuel oil. Ven-Fuel will be given sufficient notice in advance of equipment purchase to excercise [*sic*] the 30 day agreement cancellation option. And Ven-Fuel will not incurr [*sic*] any liability to, or become obligated to remit money to Southland Oil until we have reached an agreement

with Savannah Electric. Please indicate your acceptance of this understanding. Based on Ven-Fuel's failure to disclose the March 22 letter, the Trial Court found Ven-Fuel guilty of a fraudulent practice.[15]

### Applying The Law Is Even Worse . . .

■ Ven-Fuel was convicted under 18 U.S.C.A. § 542, which provides in pertinent part:

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties . . .

Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

Section 542 does not on its face require that false or fraudulent statements relating to the entry or attempted entry of merchandise be material. However, we believe that for the statute to make sense, materiality must be read into it. Indeed, the Ninth Circuit has explicitly held that materiality is an essential element of 18 U.S.C.A. § 542. *United States v. Rose*, 9 Cir., 1978, 570 F.2d 1358.[16]

---

**15.** The Trial Court stated:
In the Court's judgment, neither [the March 21 letter nor the SEPCO/Southland letter] presented an accurate picture of the facts of the matter; moreover, the one document that would have clarified matters—the March 22 letter—was withheld. This was, at least, a "false or fraudulent practice."
454 F.Supp. at 882.

**16.** The Court in *Rose* reasoned:

Admittedly, § 542 does not on its face include the word "material." It does, however, require that the attempt to introduce imported merchandise into the United States be "*by means of* any false statement." (Emphasis added.) If the false statement is not material, it cannot be said that the attempt was made to import the merchandise "by means of" the statement.
570 F.2d at 1363.

In addition to materiality, the Government must show (1) that the statement was in fact false, (2) that Ven-Fuel knew the statement was false, and (3) that as a result of the false statement, Ven-Fuel introduced or attempted to introduce residual fuel oil into interstate commerce. We find it unnecessary to review the evidence relating to these three elements,[17] since we hold that the Trial Court erroneously found that the Government proved materiality beyond a reasonable doubt.[18]

"Materiality" is generally "applied as an objective test of the significance of a fact to the transactions under consideration." *Castaneda-Gonzalez v. Immigration and Naturalization Service*, D.C.Cir., 1977, 183 U.S.App.D.C. 396, 410, 564 F.2d. 417, 431. In analyzing the materiality of a false statement, "we are constrained to require a reasonable showing of the potential effects of the statement." *United States v. Beer*, 5 Cir., 1975, 518 F.2d 168, 172. The materiality of a false statement "rests upon a factual evidentiary showing, but the ultimate decision is a legal one." *Id.*

On the surface, it would appear that fraudulent statements with respect to the existence of a throughput agreement may be highly material, since the existence of a throughput agreement is the sole requirement for obtaining an import license. Under this reasoning, Ven-Fuel's failure to disclose the March 22 letter would constitute a material fraudulent misstatement, since the March 21 letter merely contained a standard right-to-cancel clause, while the March 22 letter clearly revealed the contingent nature of the throughput agreement.

However, we reject this superficial approach. Instead, we hold that even though a throughput agreement is required to obtain an import license, fraudulent statements relating to the quality of this throughput agreement are immaterial as a matter of law to the importation of residual fuel oil. The Government conceded at oral argument—and our own examination of the regulations then in effect[19] confirms—that the throughput agreement which entitles a company to an import license has no significance whatsoever with respect to the actual importation of the oil. That is, even assuming Ven-Fuel had a binding throughput agreement with Southland, the applicable regulations did not require Ven-Fuel to actually use the Southland terminal in importing oil pursuant to the license. Indeed, the license itself explicitly stated that the residual fuel allocated was "for entry for consumption or withdrawal from warehouse for consumption . . . at any port of entry [in District I]." (Emphasis added.) And the license nowhere referred to the Southland/Ven-Fuel throughput agreement. Thus, Ven-Fuel did not violate the regulations or the terms of the license by importing the fuel into Jacksonville. Absent a logical nexus between the throughput agreement requirement and the actual importation of fuel, we cannot say that misstatements regarding the quality of the throughput agreement are material for purposes of 18 U.S.C.A. § 542.

### *But For The Reasons Stated We Must Reverse.*

Since we fail to see how a misrepresentation regarding the quality of this throughput agreement is material to the importation of residual fuel oil, we must reverse the conviction.

REVERSED.

---

17. We do point out, however, that after a careful reading of the record, we think the Trial Judge's finding that Ven-Fuel knowingly made a false representation was not unreasonable.

18. The Government must of course establish each essential element beyond a reasonable doubt. See, e.g., *United States v. Lange*, 5 Cir., 1976, 528 F.2d 1280, 1288.

19. 32A CFR Ch. X § 12 (1973).