**UNITED STATES of America,**

v.

**BAGNALL, Allan J., Appellant in No. 89–5801,**

**and**

**Bagnall, Beverly Jayne, Appellant in No. 89–5802.**

United States Court of Appeals, Third Circuit.

Argued Jan. 31, 1990.

Decided July 6, 1990.

Rehearing Denied Sept. 20, 1990.

Joshua D. Lock (argued), Harrisburg, Pa., for appellants.

William A. Behe (argued), Sally A. Lied, U.S. Atty's. Office, Harrisburg, Pa., for appellee.

Before STAPLETON and MANSMANN, Circuit Judges, and ACKERMAN, District Judge.*

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellants Allan J. Bagnall and his wife, Beverly J. Bagnall, were each convicted of two counts of introducing and attempting to introduce imported merchandise into the commerce of the United States by means of false statements, in violation of 18 U.S.C. § 542. Allan Bagnall was additionally convicted of one count of conspiracy in violation of 18 U.S.C. § 371. The Bagnalls appeal from the judgments of sentence, challenging their convictions on sufficiency of the evidence grounds. We conclude that the Bagnalls' automobile purchase scheme did not violate § 542, and therefore the convictions must be reversed.

I.

The "Diplomatic Tourist Order Program" (DTOP) is a promotional program of Mercedes–Benz of North America, Inc. ("Mercedes–Benz") through which foreign diplomats and American citizens holding "official passports"[1] can purchase Mercedes–Benz automobiles for their personal or family use at a ten percent discount off the European delivery price. Eligible DTOP participants can place orders through Mercedes–Benz dealers either in the United States or abroad, and may accept delivery of their cars at either location. However, only those persons currently serving on a foreign assignment, or designated to embark on one, are eligible to participate in the DTOP.

In order to purchase a vehicle through the DTOP, the buyer must submit the following materials: (1) a completed dealer order form and three pre-printed Mercedes–Benz forms; (2) a "Certificate of Status" signed by an authorized representative from the purchaser's place of employment, verifying the purchaser's employment status and passport information;[2] (3) a verification letter signed by an authorized representative from the purchaser's place of employment, attesting to the fact that the purchaser currently enjoys diplomatic privileges and immunities; (4) a "Customs License Plate Application" in order to permit overseas operation of the vehicle; and, (5) a "Shipping and Handling Authorization" authorizing Mercedes–Benz to accept delivery of the vehicle and deliver it to the dealer through which it was ordered.[3] Once a purchaser completes these forms and assembles the requisite documentation, the local Mercedes–Benz dealer forwards the materials to a Mercedes–Benz zone office for review and processing. If approved, the paperwork is sent to the manufacturer in Germany, production of the vehicle is commenced, and a "confirmation of order" and invoice are mailed to the customer. Upon importation of the car, Mercedes–Benz furnishes copies of the "confirmation of order" and invoice to the United States Customs Service to document valuation.

---

\* Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

1. "Official" passports are issued to American citizens who are stationed in foreign countries by the United States government.

2. The "Certificate of Status" form also requires that the purchaser sign the following certification:

I certify that this Mercedes–Benz automobile is purchased for my personal or family use, and not for resale, commercial use or as an accommodation to any other person, and that the automobile will be registered in my name.

3. Inasmuch as the vehicle belongs to the purchaser once it leaves the factory in Germany, the purpose of the "Shipping and Handling Authorization" form is to permit Mercedes–Benz to accept the vehicle upon shipment to the United States and deliver it to the dealer through which it was ordered.

Allan Bagnall's involvement with the DTOP began in May, 1984, when he placed a DTOP order for a Mercedes–Benz model 380 SLCR through Lee Stotsky at the Diehl Motor Company, Inc. ("Diehl"). Bagnall, his wife and son had each been issued official passports several years earlier when Bagnall worked in West Germany as a computer analyst for the National Security Agency ("NSA"). Although still employed by NSA at the time he ordered the car, Bagnall was nonetheless ineligible for DTOP participation since his official passport had expired shortly before he placed his order and he was no longer serving on a foreign assignment nor scheduled to depart on one. He used the number from his expired official passport in completing the requisite order forms, and supplied Stotsky with all of the required paperwork except for the NSA verification letter.

When Bagnall later decided that he could not afford the car, he agreed to permit Stotsky, the car dealer, to use his name and official passport number to proceed with the planned DTOP discount purchase in exchange for a thousand dollars. Stotsky could then sell the car at the American fair market value, realizing the amount of the DTOP discount as profit. Bagnall and Stotsky also discussed the possibility of repeating the scheme with other holders of official passports, among them Bagnall's wife and son.

The order for the first car proceeded using the paperwork that Bagnall had originally prepared when he placed his order for the 380 SL Coupe, although the dealer order forms were altered so that the more expensive 500 SEL model would be ordered instead. The order forms were then forwarded to the zone office for review, and Stotsky was advised that Bagnall would have to provide the NSA verification letter in order to prove his DTOP eligibility. The letter had to be executed by an authorized NSA representative on the agency's stationery, certifying that Bagnall currently enjoyed diplomatic privileges and immunities. Inasmuch as his official passport had expired and he no longer did enjoy diplomatic privileges and immunities, the requested documentation was falsified. NSA

employee Carol Giffin testified at trial that Bagnall contacted Candy Jolles, who was Giffin's roommate as well as the Mercedes–Benz Washington, D.C. Zone Coordinator, and that Jolles enlisted Giffin to obtain blank NSA letterhead. A false verification letter was then prepared on this NSA stationery. On September 21, 1984, after manufacture and delivery of the 500 SEL, Diehl Motors issued a check for one thousand dollars payable to Allan Bagnall. In late September, 1984, Stotsky processed DTOP orders for two additional 500 SEL Mercedes–Benz vehicles, one in the name of Beverly Bagnall and one in the name of Scott Bagnall, using order forms which were signed in blank and submitted to Stotsky. These cars were scheduled to be produced in November, 1984.

However, shortly after submission of the order forms for the second and third cars, the Bagnalls became aware that NSA was conducting an investigation into DTOP abuses, and that Carol Giffin had been questioned regarding her knowledge of NSA employees signing DTOP "Certificate of Status" forms in blank to be used by others to purchase cars. Beverly Bagnall then called Stotsky and asked that he cancel the orders for the second and third cars and return the paperwork to her. Although Stotsky testified that he directed that the orders be canceled, the orders were in fact not canceled and the second and third cars were delivered in January, 1985. Defense testimony at trial indicated that the Bagnalls were never aware that the orders for the second and third cars proceeded against their directive because Stotsky had taken out a post office box in Hellam, Pennsylvania and had used that address on the order forms. Thus the "confirmation of order" documents were sent by Mercedes–Benz to the Hellam address rather than to the Bagnalls' address. The defense further contended that the Bagnalls never received any payment for use of Beverly and Scott's passport numbers on the order forms for the second and third cars, but rather that Stotsky and Jolles divided the profits.

In these consolidated appeals, the Bagnalls raise two sufficiency of the evidence arguments. First, they contend that the false statements contained on their DTOP order forms were not material to the importation of the vehicles within the meaning of § 542. Second, they contend that Beverly Bagnall's cancellation of the orders for the second and third cars constituted a renunciation. We can affirm only if we can conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Ruuska*, 883 F.2d 262, 263 (3d Cir.1989) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

## II.

Section 542 provides in pertinent part: Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties ... [s]hall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

18 U.S.C. § 542.

█ In order to secure a conviction under § 542, the government must prove not only that the defendant introduced, or attempted to introduce, imported merchandise into our commerce and in connection with doing so, knowingly or recklessly made a false statement, but must also show that the statement was material, i.e. that the introduction or attempted introduction of goods was "by means of" the false statement. *United States v. Steinfels*, 753

F.2d 373, 377 (5th Cir.1985) (citing *United States v. Ven–Fuel, Inc.*, 602 F.2d 747, 752–53 (5th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980)); *United States v. Rose*, 570 F.2d 1358, 1363 (9th Cir.1978). As this appeal well demonstrates, the content of the materiality element depends upon what one believes to be the objective of the statute.

The Bagnalls argue that the purpose of the statute is to keep out of United States commerce those goods that cannot lawfully be imported. As a result, they contend that § 542 applies only to the introduction into domestic commerce of goods that would be ineligible for importation but for the false statement. Thus, the Bagnalls insist that their false statements were not material under § 542 because U.S. Customs officials would have permitted the importation of the cars without regard to whether the owner was the holder of a diplomatic or "official" passport.

The district court rejected this argument, adopting instead the government's far broader understanding of materiality. In denying the Bagnalls' post-verdict motions, the court explicitly found that the materiality element of § 542 was satisfied:

> The false statements triggered the production of specific vehicles in Europe and caused their shipment to the United States. They were imported into commerce in direct response to and 'by means of' the improper conduct of the defendants. Had Mercedes–Benz been aware that the defendants were not qualified to participate in its diplomatic discount program the orders would not have been processed, specific cars would not have been assembled, and no related importation would have occurred.

Appendix at 406.

█ Although we must necessarily consider the facts in evidence to determine whether the false statements at issue were material under § 542, the ultimate determination of materiality constitutes a question of law, *United States v. Ackerman*, 704 F.2d 1344, 1348 (5th Cir.1983) (citing *Ven–Fuel, Inc.*, 602 F.2d at 753), and therefore our scope of review is plenary.

We find that the government's view, adopted by the district court, accords the materiality element of § 542 a broader scope than is warranted. If one includes within the concept of materiality any false statement that plays a role in causing merchandise to be manufactured for importation into the United States, one sweeps within the statute any false statement made by anyone, wherever located, in the course of entering an agreement calling for the importation of foreign goods into the United States. Any false statement having a "but for" causal relationship with the production of foreign goods for importation would thus be a violation of the statute whether or not it had any effect on the importation process itself. In the absence of any indication in the statutory language or legislative history of § 542 that Congress was attempting to protect not just the integrity of the importation process but also the integrity of international commerce generally, we decline to conclude that Congress intended the statute to sweep so broadly. Accordingly, we reject the government's materiality standard.

At the same time, however, we find ourselves troubled by the Bagnalls' proposed definition of the § 542 materiality requirement. Relying on *United States v. Teraoka*, 669 F.2d 577 (9th Cir.1982), the Bagnalls urge a very narrow construction of the required nexus between the false statement and the importation of the goods in question, contending that § 542 encompasses only those false statements which are necessary to the importation of otherwise ineligible or conditionally eligible goods. In *Teraoka*, the Ninth Circuit Court of Appeals found no § 542 violation where falsely inflated prices were placed on shipping invoices in an effort to avoid imposition of a special assessment under an antidumping law. The court concluded that the false statements lacked the requisite "relationship to importation" because the goods still would have been eligible for importation even if the true invoice prices had been supplied to customs officials, and because the false invoice prices only related to the triggering of the special assessment, not to the importation process itself.

We agree with the Bagnalls that *Teraoka* can be read to support their narrow view of the statute. The foundation of this narrow view, however, is the assumption that the purpose of § 542 is limited to keeping out of United States commerce those goods that cannot lawfully be imported. As we read the text of the statute, its target does not appear so limited.

The language of § 542 suggests to us that its purpose is no less than to preserve the integrity of the process by which foreign goods are imported into the United States. As a result, we are inclined to believe that a false statement is material not only if it is calculated to effect the impermissible introduction of ineligible or restricted goods, but also if it affects or facilitates the importation process in any other way. *See United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 762 (1st Cir.1985) (§ 542 "convictions have regularly been sustained where generically importable goods have been entered by trick or artifice"); *United States v. Ackerman*, 704 F.2d 1344, 1348 (5th Cir.1983) (§ 542 violated where defendant falsely undervalued goods in order to change the way in which the goods were handled at customs, i.e. to avoid delay caused by having to produce certificates of origin for goods valued over a certain amount); *United States v. Murray*, 621 F.2d 1163 (1st Cir.) (false statement as to value and country of origin of goods violated § 542), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980). Under this view, for example, a false statement to customs authorities resulting in a lower duty than would otherwise be collected is material. *United States v. Brown*, 456 F.2d 293 (2d Cir.) (§ 542 conviction upheld where defendant submitted fraudulent invoices which undervalued goods and falsely asserted to customs officials that there existed no other invoices, in order to avoid payment of full duty), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972); *cf. United States v. Twenty-five Packages of Panama Hats*, 231 U.S. 358, 360–61, 34 S.Ct. 63, 64–65, 58 L.Ed. 267 (1913) (civil forfeiture provision of predecessor statute to § 542

applied where invoice forms contained false valuation of goods); *United States v. Barbanell*, 231 F.Supp. 200 (S.D.N.Y.1964) (§ 542 violated where false invoices were used to avoid payment of full duty).

■ Nevertheless, we need not decide whether the materiality requirement of § 542 incorporates the broader view we postulate or is limited to the Bagnalls' narrow interpretation. Under either view, the government did not carry its burden of proof. As the government concedes, the cars which the Bagnalls ordered through the DTOP were properly importable goods, constituting neither contraband otherwise ineligible for introduction into the country, nor goods which were conditionally restricted and would not have been admitted but for the false statements at issue. Moreover, because there were no false statements made by the Bagnalls to customs officials, they did not in any way compromise the integrity of the importation process. While the duty paid was less than it would have been if the cars had not been purchased at the DTOP discount price, the duty payable was based on the price paid to Mercedes–Benz, and that price was accurately reported to customs authorities. The problem here was not that the customs authorities were misled regarding any facts relevant to the process of admitting the cars into domestic commerce, but rather that Mercedes–Benz was deceived into offering the Bagnalls a better deal than it would have offered them had it known all of the facts relevant to its promotion and discount policies. As we have indicated, we do not think that this was the kind of problem Congress had in mind when it passed § 542.

### III.

We conclude that there was insufficient evidence to convict the Bagnalls of violating § 542 or of engaging in a conspiracy to violate that statute.[4] Accordingly, the judgments of conviction will be reversed.

MANSMANN, Circuit Judge, dissenting.

I dissent, not because I disagree with the court's standard, but because I believe the government *has* met its burden under § 542. The majority states, *supra*, that [t]he language of § 542 suggests to us that its purpose is no less than to preserve the integrity of the process by which foreign goods are imported into the United States. As a result, we are inclined to believe that a false statement is material not only if it is calculated to effect the impermissible introduction of ineligible or restricted goods, but also if it affects or facilitates the importation process in any other way.

At 436. With this, I agree. I diverge from the majority, however, because I believe the government did carry its burden of proof since the statements made by the Bagnalls were material in that they "facilitate[d] the importation process," as the facts bear out.

As the majority has explained, Mercedes–Benz operated a promotional program which enabled an individual holding a diplomatic or official passport to receive a ten (10) percent discount on the purchase of the European delivery of a Mercedes–Benz car. Despite the fact that his diplomatic passport was expired, Bagnall submitted paperwork, including a Certificate of Status, substantiating his entitlement to participate in the program and receive the discount. Bagnall also submitted an application for a customs license plate and a shipping and handling authorization which permitted Mercedes–Benz to ship the car to the United States port of entry chosen by the customer and effect customs clearance.

Shortly after he ordered the 380 SLCR, Bagnall called the salesman and explained that he could not afford the car. He offered, however, to allow the salesman to use his name to order a car using the forms he had submitted. Bagnall further suggested that if the deal went through and the car arrived, he knew other people who would do the same thing. The salesman agreed to pay Bagnall $1,000 for use of the

---

**4.** In light of this disposition, we need not address the Bagnalls' renunciation argument.

application forms. The salesman then changed the model number from 380 SLCR to a 500 SEL.

After the necessary paperwork was submitted pursuant to the diplomatic plan, the 500 SEL was scheduled for production and was then manufactured and shipped to the United States. When the 500 SEL arrived, the salesman wrote Bagnall a check for $1,000. In September, 1984, shortly after Bagnall received the check, the salesman ordered two more 500 SEL cars in the names of Beverly Jayne Bagnall and Scott Richard Bagnall. The forms were submitted, including Certificates of Status as previously described. Shortly afterward, when the NSA learned of the use of NSA Certificates of Status when an employee of the NSA turned in a blank form that was circulated in the office, NSA employee Carol Giffin notified Bagnall that an investigation was underway. Beverly Bagnall then attempted to cancel the two orders and to retrieve the forms from the Mercedes–Benz salesman.

It is uncontested that the order would not have been accepted under the diplomatic discount plan nor the car manufactured without the forms. The record shows that the order for the first 500 SEL was placed after receipt of the forms. Clearly, the

order resulted from the application forms which included the false statements that the car was being purchased for Bagnall's personal use and not for resale or commercial use, and the false Certificate of Status. In other words, "but for" the false statements by the Bagnalls on their Certificates of Status, the cars would not have been manufactured and shipped. Because the statute states that "whoever ... attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false ... affidavit ..." shall be liable, I conclude that the false statements on the Certificates of Status, as well as the DTOP forms, fall within the meaning of the statute.[1] For these reasons, I would affirm the order of the district court denying the Bagnalls' post-trial motions.

---

1. Because I would hold that the government had met its burden and that the false statements were material to the importation of the cars, I would then address the remaining issues. The first is whether Beverly Jayne Bagnall's attempt to retrieve the documents constituted a renunciation of the attempted importation of the cars. I would hold that it was not.

Mrs. Bagnall's attempt to retrieve the documents was the result of the warning from Ms. Giffin that the NSA was conducting an investigation of the improper use of NSA Certificate of Status forms. Thus, the attempt to cancel the orders was not the result of a genuine change of heart, but was the result of a fear of being apprehended for the crime. Because the defense of renunciation is an affirmative defense, the burden is on the defendant to show an abandonment of the efforts to commit the crime under circumstances which manifest a complete and voluntary renunciation of the criminal purpose. *United States v. McDowell*, 705 F.2d 426 (11th Cir.1983) and *United States v. Bailey*, 834 F.2d 218 (1st Cir.1987). Here, Beverly Jayne Bagnall proved only that she attempted to retrieve the documents under a situation which

could best described as an involuntary withdrawal.

The Bagnalls' final argument related to the sufficiency of the evidence with regard to the two counts of attempt under § 542, *i.e.*, the two orders Beverly Bagnall endeavored to cancel. The Bagnalls contend that, since an attempt requires a substantial step toward the commission of the crime, *see* MPC § 5.01, the submission of the applications to the Mercedes–Benz salesman was not sufficient to meet the requirements of the elements of attempt. Mere preparation, the Bagnalls state, is inadequate to constitute an attempt to commit the crime.

I also would reject this argument. The record indicates that the actions taken by the Bagnalls were more than mere preparation. The efforts undertaken to secure the handstamp of a NSA official, the submission of the false Certificates of Status, and the submission of the falsified diplomatic plan applications (thereby resulting in the placement of the order) went beyond mere preparation. Indeed, all that remained was for the cars to be received by the dealership and the check to be paid to the Bagnalls for the "use" of their official status.