UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence ROSE, Defendant-Appellant.

No. 76–2953.

United States Court of Appeals,
Ninth Circuit.

Feb. 28, 1978.

Susan B. Jordan (argued), San Francisco, Cal., for defendant-appellant.

Peter Mair, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

Before MERRILL, WRIGHT and AN-DERSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Appellant was convicted on one count of violating 18 U.S.C. § 542 (Count I) and two counts of violating 18 U.S.C. § 1001 (Counts II and III). His prison sentences were suspended, he was placed on probation, and he was fined $5,000, $10,000 and $10,000 on the respective counts.

The issues on appeal are:

(1) whether appellant waived his right to counsel, thus justifying the court's denial of his motion to suppress in-custody statements;

(2) whether customs officials were required to have given *Miranda* warnings before questioning appellant at the border;

(3) whether physical evidence seized at the airport should have been suppressed;

(4) whether a single false statement can justify separate convictions under §§ 542 and 1001 respectively; and

(5) whether the false statement upon which Count III is grounded was material.

FACTS:

Appellant was in transit from Germany to the United States when he submitted to a routine U. S. Customs inspection in Vancouver, British Columbia. Appellant's false statement that he had only two cameras to declare is the basis of the offenses in Counts I and II.

Suspecting Rose's suitcases had false bottoms, the customs officer asked appellant to take them to the customs office, purportedly to pay duty on the cameras. Appellant placed the suitcases on a rack and left the airport.

A Canadian officer then searched them and found that the false bottoms contained a substance later determined to be ergatomine tartrate, a dutiable item but not a controlled substance.

Appellant subsequently arrived at the border at Blaine in a rented automobile. Appellant's false responses to a routine series of questions by the border agent gave rise to the charge in Count III. Upon learning that appellant was the suspect who had disappeared from the Vancouver airport, the agent took him into custody.

When agents of the Drug Enforcement Agency (DEA) arrived, appellant was given *Miranda* warnings. He responded orally that he understood and waived his rights. When the DEA agents suggested that he cooperate with them and complete delivery of the drug, he asked to speak with an attorney friend. The agents suggested that it would be wiser to call another attorney who did not know any of his co-conspirators. After about twenty minutes of thought, alone, appellant decided to cooperate with the agents without calling his attorney friend. On the following day, appellant was questioned at the DEA office in Seattle, and again waived his *Miranda* rights. Yet again, he waived his right to counsel in an appearance before a magistrate, at which he was released on his own recognizance. Appellant claims that he requested an attorney after the hearing before the magistrate, and that the request was not honored.

DEA agents then accompanied appellant to San Francisco, where they stayed together in a hotel for two days. Appellant twice mentioned his attorney friend. On the first occasion, the agents said that they could not find her listed in the telephone directory. On the second occasion, appellant was despondent and sobbing and the agents said that he was free to call his attorney, but that it would be better if he first regained his composure. He did not renew his request for counsel after he calmed down.

Appellant also consented to a search of his home and a tap on his phone. He ceased cooperating with the DEA agents only when he left the hotel to stay in his own home.

DISCUSSION:

This case presents several sequences of appellant's waiver of his right to counsel, followed by his expressed doubts and alleged revocations. Appellant argues that revocations of his waivers were ignored, and that his repeated requests for the assistance of a named attorney were not honored.

We recently decided, in *United States v. Rodriguez-Gastelum,* 569 F.2d 482 (9th Cir. January 30, 1978) (en banc), that the Supreme Court has not mandated a per se rule that would eliminate any possibility of a waiver of the right to counsel once the suspect has asked for an attorney. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232 (1977); *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 40 L.Ed.2d 313 (1975). To rule out the possibility that a suspect, having initially asserted his right to counsel, might voluntarily and intelligently waive that right, "would serve only to handcuff our law enforcement officers in the performance of their duties and to imprison the suspect in his alleged constitutional privileges." *United States v. Rodriguez-Gastelum,* supra at 488.

█ In the hearing on the motion to suppress, the district judge was in a better position than are we to judge the credibility of the witnesses. We believe his findings of fact support a conclusion that appellant waived his right to counsel and, after considered reflection, repeatedly withdrew his revocations of that waiver, or failed to effectuate the revocation.

Of particular interest is the fact that appellant initially agreed to waive his rights and to cooperate with the government agents. In such a situation, it is not surprising that a suspect will later have doubts about his complicity. We should not require that such doubts automatically bring to a halt all such cooperative investigatory endeavors.

█ The agents acted properly. When appellant asked to see his attorney friend, they simply advised him that, because of her involvement with some co-conspirators, he might prefer to talk to another attorney if he were interested in continuing the cooperative venture with the DEA agents. Likewise, when he broke down in his hotel room, they advised that he was free to call his attorney friend, but that it might be better to compose himself first. That sort of advice did not amount to undue pressure. It was intended only to contribute to his fair evaluation of his situation and to aid in his decision. We conclude, under the standards of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), that appellant repeatedly waived his right to counsel, and consequently that it was not error to admit his in-custody statements.

█ The second issue involves whether the customs agent who questioned appellant at the border should first have advised appellant of his *Miranda* rights. Although the agent on duty at Blaine had been alerted by the DEA, he stated that his questioning was routine and that he did not realize appellant was the one about whom the DEA had issued an alert until he saw the name on his student identification card.

Appellant argues that because the notes of a supervisor indicated that the agent recognized appellant by the description given by the DEA and because the agent recorded appellant's arrival at a rather exact time, he was detained for custodial purposes. The district judge was in a better position than are we to evaluate the agent's credibility. Border agents receive a variety of alerts nearly every hour and they process hundreds of vehicles and persons in relatively short periods of time. The factors pointed to by appellant do not amount to a showing that the district judge was clearly in error. The interrogation was not custodial, and the court properly admitted the evidence.

█ The third issue involves the admissibility of the physical evidence seized at the airport. The Fourth Amendment exclusionary rule does not apply to foreign searches by foreign officials in enforcement of foreign law, even if those from whom evidence is seized are American citizens. *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir.), *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965). An underlying reason is the doubtful deterrent effect on

foreign police practices that might follow from a punitive exclusion of the evidence by an American court. *Brulay v. United States,* 383 F.2d 345, 348 (9th Cir.), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967).

■ Two exceptions to this general rule have been expressed. First, if the circumstances of the foreign search and seizure are so extreme that they "shock the [judicial] conscience," a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence. *Birdsell, supra* at 782, n.10. No one contends that this applies here.

■ "Second, if American law enforcement officials participated in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked." *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir. 1976). This circuit has stated the test of undue participation:

> Thus, the Fourth Amendment could apply to raids by foreign officials only if Federal agents so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials.

*Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 *reh. denied,* 396 U.S. 870, 90 S.Ct. 39, 24 L.Ed.2d 125 (1969).

In this case, the United States Customs officials conveyed their suspicions about Rose's luggage to the Canadian police, but they neither directed nor requested that the Canadians search the luggage. United States officials were not present in the Vancouver police office where the bags were searched and the ergatomine tartrate discovered. After this discovery, it was the Canadian drug squad which was called to analyze the chemical. Finally, it was the Canadians who sought out the DEA.

■ To decide whether a joint venture has occurred, the court must closely "scrutinize the attendant facts." *Byars v. United States,* 273 U.S. 28, 32, 47 S.Ct. 248, 71 L.Ed. 520 (1927). In *Byars,* the Court held a state search and seizure to be the act of the United States when a federal officer accompanied state officers to the premises to be searched and participated in the actual search. The federal agent selected certain evidence for use in a federal prosecution and kept exclusive possession of it.

In *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), the Court found a joint endeavor when a federal officer joined the search party before the arrival of defendants who were arrested and searched in his presence. The Court stated: "So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it." 338 U.S. at 79, 69 S.Ct. at 1374. Finally, in *Corngold v. United States,* 367 F.2d 1 (9th Cir. 1966), a federal officer sought the assistance of an airline employee in locating and opening a package. As this court noted in a subsequent case:

> [T]he airline employee would not have conducted a search but for the insistence of the Federal agent, and even then he did so reluctantly.

*Stonehill v. United States, supra* 405 F.2d at 745.

■ When compared to these cases, the facts in this case do not require the conclusion that a joint venture existed. The customs officials neither ordered nor directed the search. They did not participate in it. There is no evidence that United States agents were attempting to undermine the Fourth Amendment rights of a citizen "by circuitous and indirect methods," as proscribed by the Court in *Byars.* Because the Fourth Amendment exclusionary rule is inapplicable, the court properly admitted the evidence.

The fourth issue involves the overlapping convictions on the first two counts. The first was for a violation of 18 U.S.C. § 542; the second was for making a false statement in violation of 18 U.S.C. § 1001. Convictions on both counts arose from defendant's statement that he had only two cameras to declare when in fact he knew that he was also carrying ergatomine tartrate, a

dutiable item he had acquired abroad. The court assessed fines for each count, to be computed cumulatively. Defendant challenges the cumulation of the fines.

*Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), provides that "the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.* at 304, 52 S.Ct. at 182.

Under § 542, there must be (1) an attempt to introduce imported merchandise into the United States (2) "by means of" any false statement or practice (3) without reasonable cause to believe the truth of such statement or practice. The elements of a § 1001 violation include (1) knowingly making a false statement (2) which is material and (3) made with regard to any matter within the jurisdiction of any department or agency of the United States.

The government argues that cumulative sentencing is permitted since element 1 of § 542 is not an element of § 1001, and because element 2 of § 1001, materiality, is not an element of § 542. Because we consider the latter assertion inaccurate, the cumulative sentencing must fall under the *Blockburger* rule.

Admittedly, § 542 does not on its face include the word "material." It does, however, require that the attempt to introduce imported merchandise into the United States be "*by means of* any false statement." (Emphasis added.) If the false statement is not material, it cannot be said that the attempt was made to import the merchandise "by means of" the statement.

The earliest version of § 1001 dates back more than a century. Its original concern was to penalize those who made fraudulent monetary claims against the government.

This court has recognized that:

[I]f . . . section 1001 were read literally, virtually any false statement, sworn or unsworn, written or oral, made to a Government employee could be penalized as a felony. Thus read, section 1001 would swallow up perjury statutes and a plethora of other federal statutes proscribing the making of false representations in respect of specific agencies and activities of Government. Extension of section 1001 to its literal breadth, however, cannot be justified by its legislative history. (Footnote omitted.)

*United States v. Bedore,* 455 F.2d 1109, 1110 (9th Cir. 1972).

The panel in *Bedore* understood § 1001 to reach "only those false statements that might support fraudulent claims against the Government, or that might pervert or corrupt the authorized functions of those agencies to whom the statements were made." *Id.* at 1111. To serve that legislative mandate, the section need not "swallow up" other federal statutes prohibiting the making of a specific kind of false representation.

Instead, properly construed, the statute serves as a catch-all, reaching those false representations that might "substantially impair the basic functions entrusted by law to [the particular] agency," but which are not prohibited by other statutes. The legislative history reveals no evidence of an intent to pyramid punishment for offenses covered by another statute as well as by § 1001. We conclude that convictions on the first two counts are redundant and that the conviction for violation of § 1001 (Count II) must be vacated.

Appellant finally contends that his response to the customs agent's questions at the border as to whether he had traveled overseas (the basis of Count III) did not constitute a material falsehood within the meaning of § 1001. He said that he had not been abroad and that he had spent the last two weeks in Vancouver.

In *United States v. Bedore, supra,* the panel held that § 1001 did not apply to Bedore's misrepresentation of his name to an FBI agent seeking to serve him with a subpoena. "Typical of the kind of statements that are within the purview of section 1001 are false reports of crime made to federal law enforcement agencies that may

engender groundless federal investigations." 455 F.2d at 1111. Examples include false reports of bribery made to an FBI agent and false statements under oath to the Immigration and Naturalization Service to secure voluntary departure. *See United States v. Adler,* 380 F.2d 917 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *Tzantarmos v. United States,* 402 F.2d 163 (9th Cir. 1968), *cert. denied,* 394 U.S. 966, 89 S.Ct. 1312, 22 L.Ed.2d 569 (1969).

■ We agree with the panel in *Bedore* :

> The statute was not intended to embrace oral, unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or to a claim against the United States, given in response to inquiries initiated by a federal agency or department, except, perhaps, where such a statement will substantially impair the basic functions entrusted by law to that agency. (Citations omitted.)

455 F.2d at 1111.

■ Although the statement in this case was oral, unsworn and unrelated to any monetary claim against the United States, the declarant was claiming the privilege of entry, and his statement potentially impaired the function of the Customs Service.

The border agent testified that persons coming from overseas were referred automatically to a more rigorous inspection than those who had stayed in Canada. Instead of referring Rose for secondary inspection, the agent testified that he had been on the verge of letting him proceed. Although in this factual situation contraband was not allowed into the United States by Rose's statement, the statement had the "intrinsic" capability of bringing it about. *United States v. Quirk,* 167 F.Supp. 462, 464 (E.D. Pa.1958), *aff'd* 266 F.2d 26 (3rd Cir. 1959), *quoted* in *Brandow v. United States,* 268 F.2d 559, 565 (9th Cir. 1959).

*United States v. Bush,* 503 F.2d 813 (5th Cir. 1974), relied on by appellant, is distinguishable. In that case, Bush was asked by an agent of the Internal Revenue Service whether he had committed a suspected misdeed. He answered with an untruthful "exculpatory 'no'." 503 F.2d at 819. Relying on its understanding of the congressional intent and influenced by Fifth Amendment concerns, the court reversed the conviction. It found that the "exculpatory no" fit within an investigatory exception to § 1001.

In our case, the border agent's inquiries were a routine exercise of his *administrative* responsibility. Moreover, a truthful answer to the inquiries would not have involved self-incrimination. We conclude that the false statement appellant made to the agent at the border crossing was material within the meaning of § 1001.

In sum, we affirm the convictions on Counts I and III and reverse the conviction on Count II.