**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald Wayne HUGHES, Defendant-Appellant.**

No. 79–1428.

United States Court of Appeals, Ninth Circuit.

May 22, 1980.

Rehearing Denied Sept. 17, 1980.

Mark E. Griffin, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Peter Robinson, Asst. U. S. Atty., Portland, Or., for plaintiff-appellee.

Before DUNIWAY and WALLACE, Circuit Judges, and JAMESON,* District Judge.

WALLACE, Circuit Judge:

Hughes appeals on various grounds from his conviction for conversion of government property, 18 U.S.C. § 641, and for violations of the Wild Free-roaming Horses and Burros Act of 1971, 16 U.S.C. §§ 1331–1340. We affirm.

* Honorable William J. Jameson, United States District Judge, District of Montana, sitting by designation.

I.

The Wild Free-roaming Horses and Burros Act (the Act) was enacted to preserve and protect "wild free-roaming horses and burros" on the public lands of the United States. See 16 U.S.C. § 1331. To implement the declared policy to protect these animals from "capture, branding, harassment, or death," id., Congress enacted criminal provisions which defined and established punishment for various offenses. Id. § 1338. Congress' constitutional authority to regulate and protect the wild horses on the public lands was upheld in Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

Hughes was a participant in the Adopt-a-Horse program conducted by the United States Bureau of Land Management (BLM), pursuant to the authority granted by the Act, 16 U.S.C. § 1333(b). Under the program, "excess wild free-roaming horses," id., are captured and loaned to private individuals for their use. Applicants for the program were advised that the animals were assigned for the lifetime of the animals and that it was unlawful to sell or use for commercial exploitation any animal or its remains. Between December 1976 and February 1978, Hughes adopted 109 wild horses. At the time he adopted these horses, he signed "co-operative agreements" which included the above terms and which advised him that the horses remained the property of the government.

Between June 1977 and March 1978, Hughes sold a number of horses to a slaughterhouse buyer. The horses were subsequently processed into horsemeat for human consumption abroad. Hughes received a total of approximately $25,000 for the horses.

Hughes eventually confessed to selling the BLM horses, and a four-count indictment issued in March 1979. Hughes was convicted of (1) knowingly converting government property to his own use (Count I); (2) maliciously causing the death of the horses (Count III); and (3) permitting the

horses and their remains to be processed into commercial products (Count IV). He was sentenced to 18 months' imprisonment on Count I, and five years' probation on Counts III and IV, to run concurrently.

Hughes contends that Count I should have been dismissed on the ground either that the wild horses were not the property of the United States or that he could only be prosecuted under the more specific conversion provision of the Act. In addition, he claims that the court erred in instructing as to the malice element of Count III and in refusing to instruct the jury on Hughes' theory of the case. Finally, he argues that there is not substantial evidence in the record to sustain the conviction on Counts III and IV.

## II.

■ Hughes first contends that Count I should have been dismissed on the ground that the wild horses in question were not the property of the United States. *See United States v. Collins*, 464 F.2d 1163, 1165 (9th Cir. 1972) (government property loss an essential element of the crime of conversion under § 641). He argues that the district court improperly equated the power of the United States to regulate and protect wild horses with federal ownership of the horses. He asserts that both the language of the Act and the common law of property with respect to wild animals support the conclusion that wild horses are not the property of the federal government.

Hughes relies in part on statements which he believes indicate that Congress' intent was not to claim federal title to wild horses, but only to place them *"under the jurisdiction* of the Secretary [of the Interior] for the purpose of management and protection." 16 U.S.C. § 1333(a) (emphasis

added). *See Kleppe v. New Mexico, supra,* 426 U.S. at 541, 96 S.Ct. at 2292 (upholding Congress' "power *to regulate and protect* the wildlife [on public lands]") (emphasis added). He also argues that the Act's definition of wild horses, which includes "all unbranded and *unclaimed* horses" on the nation's public lands, 16 U.S.C. § 1332(b) (emphasis added), precludes a finding that the government has "claimed" the wild horses as its own.[1] This view is lent additional support, according to Hughes, by the statement in *Kleppe* indicating that the Secretary of the Interior made "no claim . . . that the United States owns the wild free-roaming horses and burros found on public land." 426 U.S. at 537 n.8, 96 S.Ct. at 2290 n.8.

In addition to the statutory history and language, Hughes relies on cases stating that wild animals are owned by the states in trust for the people, subject to the paramount regulatory power of the federal government. *New Mexico v. Morton*, 406 F.Supp. 1237, 1238 (D.N.M.1975), *rev'd on other grounds sub nom., Kleppe v. New Mexico, supra,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34; *Missouri v. Holland*, 252 U.S. 416, 432–34, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920); *Geer v. Connecticut*, 161 U.S. 519, 527–28, 16 S.Ct. 600, 603–604, 40 L.Ed. 793 (1896). Hughes contends that these cases limit the sovereign's role to that of a trustee, and imply that the government cannot enjoy a true personal property interest in wild animals.

We need not reach the question, however, whether Congress intended to assert a property interest in all the wild horses on public lands, nor whether the government could validly prosecute a person pursuant to section 641 for "converting" horses from the

---

1. This statutory language, however, is of doubtful significance. The legislative history makes it clear that Congress chose this language to avoid any implication that it was abrogating private claims which had vested pursuant to state property law. S.Rep.No.92–242, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Admin.News, p. 2151. But such intent has little bearing on the question whether Con-

gress was claiming title to those horses on the public lands which were not already privately owned. Whether Congress' authority over public lands would constitutionally permit the United States to make such a claim despite any conflicting state law is an issue left unanswered by *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

public lands of the United States.[2] Instead, we address the narrower issue: whether the United States had acquired a property interest in the horses which it captured, corralled, and loaned to Hughes pursuant to the Act. Several factors lead us to conclude that the government possessed a property interest in the loaned horses. First, there is substantial authority that a "sufficient federal interest" to satisfy the elements of section 641 is present when the government has "title to, possession of, or control over" the object in question. *United States v. Evans*, 572 F.2d 455, 471 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). *See also Fowler v. United States*, 273 F. 15, 16–17 (9th Cir. 1921); *Kambeitz v. United States*, 262 F. 378, 380 (2d Cir. 1919). While the mere regulation and protection of the horses on the public lands may not constitute the requisite "possession" or "control" for the purposes of this rule, a question we need not reach, the governmental decision to take some horses out of the public domain and exercise complete control and dominion over them amounts to asserting a property interest in those horses.

Second, this view receives additional support from the traditional common law rule that a person who removes an animal from its natural liberty and places it in confinement becomes its owner. *See Geer v. Connecticut, supra*, 161 U.S. at 526, 16 S.Ct. at 603; *Koop v. United States*, 296 F.2d 53, 59 (8th Cir. 1961). Although Hughes contends that this rule has no application unless the animal is reduced to *private* possession, no authority has been cited to us, nor have we found any, which purports to hold that the sovereign may not acquire a property interest in the same manner.

Finally, we believe that this holding is the most consistent with the purposes and approach of Congress. As initially enacted, the Act granted the Secretary of the Interior authority to have "excess wild free-roaming horses . . . captured and removed for private maintenance under humane conditions and care." 16 U.S.C. § 1333(b) (amended 1978). It appears that from the beginning of the Adopt-a-Horse program the government has taken the view that when it loans these animals to private parties, it retains an ownership interest as the means for retaining the ability to control the use made of the horses. In its dealings with Hughes, for example, the government had Hughes sign an agreement in which he acknowledged that the adopted horses remained the property of the United States. While the view of the administering agency is not necessarily conclusive on congressional intent, its view is lent strong support by recent amendments to the Act. The new provision authorizes the Secretary of the Interior "to grant title" to individuals who demonstrate that they have "provided humane conditions, treatment and care." 16 U.S.C. § 1333(c) (1978). The Secretary's statutory authority to grant title reflects our conclusion that the government claims an interest in the horses when it captures them.

Hughes argues that our conclusion is foreclosed by the statutory language providing that adopted horses retain their status as "wild free-roaming horses" until title passes pursuant to the Act. 16 U.S.C. § 1333(d) (1978). Hughes claims that since the Act limits the definition of wild horses to "unclaimed" horses, 16 U.S.C. § 1332(b), section 1333(d) implies that adopted horses remain "unclaimed" until title passes to the individual owner. We disagree. Even if the language defining wild horses was intended to have the significance which

---

2. Although in *Kleppe* the Secretary of the Interior did not claim that the United States owns the wild horses found on public land, the Supreme Court stated that "it is far from clear . . . that Congress cannot assert a property interest in the regulated horses and burros superior to that of the State." 426 U.S. at 537, 96 S.Ct. at 2290. It is not evident, however, whether the Court here refers to "title" or simply to a public trust interest that is superior to the trust interest in wild animals traditionally held by the States on behalf of their citizens. Equally ambiguous in this regard is the Senate Report statement that wild free-roaming horses "belong to no one individual," but rather "to all the American people." S.Rep.No.92–242, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Admin.News, p. 2149.

Hughes attaches to it, *see* note 1 *supra*, it does not foreclose the conclusion that the government claims an interest in the horses when it captures them. The statutory definition of wild horses is limited to those "on public lands of the United States," 16 U.S.C. § 1332(b), and yet the horses placed on private lands continue to receive protection as wild horses under the Act. The definitional language thus identifies the horses protected by the Act, but does not condition their continuing protection on the continuing existence of those identifying characteristics. Thus, adopted horses continue to receive protection as "wild free-roaming" horses even though they are neither roaming on public lands nor, strictly speaking, unclaimed.

### III.

Hughes next contends that, even if the United States owns a property interest in the horses it rounds up, the government should have been required to proceed under the Act's penal provision forbidding the conversion of wild horses to private use, 16 U.S.C. § 1338(a)(2),[3] rather than under the general conversion provision, 18 U.S.C. § 641.[4] He argues that this conclusion follows from "the principle that gives precedence to the terms of the more specific statute where a general statute and a specific statute speak to the same concern." *Simpson v. United States*, 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). The Supreme Court has stated that "[t]his guide to statutory construction has special cogency where a court is called upon to determine the extent of the punishment to which a criminal defendant is subject for his transgressions." *Id.* Whereas under section 1338 the offender is potentially subject to a

fine of $2,000 or imprisonment for not more than one year, under section 641 Hughes was potentially subject to a maximum ten-year sentence and a fine of $10,000.

Hughes argues that his contention is strengthened by the district court's decision to dismiss Count II of the indictment, which had charged Hughes with violation of section 1338. Concluding that "the first count is duplicitous of the second count," the district judge decided that the government should proceed only under the count charging conversion of government property. In addition, Hughes asserts that the legislative history of the Act reflects a congressional intent to supersede the general theft provisions found elsewhere in the United States Code. We disagree.

■ The rule favoring specific over general statutes is in tension with the "equally well established rule of construction that where two statutes, each proscribing some conduct not covered by the other, overlap, a single act may violate both, at least where there is some distinction between the elements of each offense, and the violator may be prosecuted under either." *United States v. Lamb*, 150 F.Supp. 310, 312 (N.D.Cal.1957). *See, e. g., United States v. Beacon Brass Co.*, 344 U.S. 43, 45, 73 S.Ct. 77, 78, 97 L.Ed. 61 (1952); *United States v. Noveck*, 273 U.S. 202, 206, 47 S.Ct. 341, 71 L.Ed. 610 (1927). Therefore, the issue before us is whether "[t]he distinction between the elements of [the two offenses] are sufficient that a defendant violating both may be prosecuted under either." *United States v. Manes*, 420 F.Supp. 1013, 1019–20 (D.Or.1976), *aff'd*, 549 F.2d 809 (1977). The oft-repeated test for determining whether two such offenses are really identical, though more or less general or

---

3. Section 1338(a)(2) reads in part as follows: "Any person who . . . converts a wild free-roaming horse or burro to private use, without authority from the Secretary, . . . shall be subject to a fine of not more than $2,000, or imprisonment for not more than one year, or both."

4. Section 641 reads in part:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of

another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof,

. . . . .

. . . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both;

. . . . .

specific, is to ask "'whether the same evidence is required to sustain them; if not, then the fact that both charges relate to and grow out of one transaction does not make a single offense where two are defined by statute.'" *Conerly v. United States*, 350 F.2d 679, 681 (9th Cir. 1965), *cert. denied*, 382 U.S. 1018, 86 S.Ct. 638, 15 L.Ed.2d 534 (1966) (quoting *Thomas v. United States*, 249 F.2d 429, 431 (9th Cir.), *cert. denied*, 355 U.S. 936, 78 S.Ct. 421, 2 L.Ed.2d 418 (1957)).

■ Applying this test, we find that the elements of the two offenses are sufficiently distinct to allow Hughes to be prosecuted under either provision. Despite the similarity of language, the two offenses require quite different proof. As we have seen, section 641 requires the government to prove a property loss. Section 1338, on the other hand, includes no language that could be construed as requiring such a showing by the government. Indeed, in view of the substantial doubt whether the United States owns the free-roaming horses on the public lands, *see* note 2 *supra*, it is plausible that this specific provision was thought to be essential to supplement section 641. Moreover, section 641 is a theft provision which requires a showing that the defendant "knowingly convert[ed]" property of the United States. *See Morissette v. United States*, 342 U.S. 246, 250–63, 72 S.Ct. 240, 243–49, 96 L.Ed. 288 (1952) (government must show knowledge that the taking was wrongful); *Ailsworth v. United States*, 448 F.2d 439, 441–42 (9th Cir. 1971); W. LaFave & A. Scott, Criminal Law § 89, at 652 n. 52 (1972) (equating section 641 standard with traditional embezzlement requirement that defendant "fraudulently" convert the property). Section 1338 contains no similar knowledge element, which implies that a conviction could be based on the intent to convert wild free-roaming horses to private use, with or without knowledge that the taking is wrongful. *Cf. United States v. Jones*, 607 F.2d 269, 273–74 (9th Cir. 1979), (distinguishing special *mens rea* requirement of section 641 from general intent requirement of provision prohibiting "appropriations" of "objects of antiquity," on

public lands); *United States v. Lamb, supra*, 150 F.Supp. at 313 (distinguishing section 641 from provision prohibiting unlawful taking of timber on public land, which required only intent to export or dispose of such timber). We conclude that section 641 defines a more serious crime than does section 1338.

This reasoning is consistent with our case of *Conerly v. United States, supra*, 350 F.2d 679, which we find dispositive. There the defendant argued that he could not be charged under section 641 with having "received, concealed, and retained, with intent to convert to his own use," *id.* at 679–80, assorted property of the United States Post Office, but only under a more specific charge of stealing or possessing property used by the Post Office. Because we concluded that the more specific postal provision required neither government ownership nor knowledge that the property received had been stolen, we held that there was no need to address "whether a statute making it a special offense to steal property from a Post Office controls over the more general offense of stealing any property that belongs to the United States." *Id.* at 682. *See also United States v. Manes, supra*, 420 F.Supp. at 1019–20; *United States v. Lamb, supra*, 150 F.Supp. at 312.

The cases relied on by Hughes also illustrate the application of these principles. In *Robinson v. United States*, 142 F.2d 431 (8th Cir. 1944), the Eighth Circuit held that a defendant charged with theft of government property could only be sentenced to the maximum penalty allowed by a more specific penal provision dealing with theft of postal property. The larceny offenses involved in *Robinson*, however, were identical except for the specificity with which the object of the offense was described. Both required the same *mens rea* showing and proof that the property taken belonged to the United States.

Similarly, in *United States v. Rose*, 570 F.2d 1358 (9th Cir. 1978), we held that a defendant could not be convicted for falsely declaring the amount of imported merchan-

dise subject to duty pursuant to both general and specific fraud provisions. There we rejected the government's contention that the general provision against defrauding government agencies included an additional requirement of materiality not present in the more specific provision against attempting to introduce imported merchandise "by means of" a false statement or practice. *Id.* at 1363. Materiality was implicit in the requirement that the attempt to import the merchandise be "by means of" the statement. *Id.*

We stated in *Rose* that the general fraud provision in question was "a catch-all, reaching those false representations that might 'substantially impair the basic functions entrusted by law to [the particular] agency,' but which are not prohibited by other statutes." *Id.* It was not designed, however, to "pyramid punishment for offenses covered by another statute." *Id.* The distinction between *Rose* and the case before us is that, while section 641 is also a catch-all provision designed to reach the theft of all government property, section 1338 of the Act is not a theft provision at all. It is in *Robinson v. United States, supra,* 142 F.2d 431, in which the government was required to proceed under the more specific theft statute, that we find a section 641 analogy to *Rose.*

The legislative history of the Act does not support, and if anything weakens, Hughes' argument. Hughes has provided no evidence suggesting that Congress intended that a defendant who stole horses from the possession and custody of the United States should not be prosecuted for theft of government property. The evidence provided indicates that Congress chose to include penal provisions within the Act, rather than within Title 18, to strengthen the ability of the government to protect wild

horses. But this does not imply an intent to limit the application of section 641. Indeed, on the basis of legislative history quite similar to this, indicating that Congress enacted criminal provisions to provide special protection to historic ruins and monuments on the public lands, we recently held that section 641 was not superseded. *United States v. Jones, supra,* 607 F.2d at 273–74. We find *Jones* controlling here. Moreover, since the legislative history suggests that Congress intended to enact stiff penalties for the harassment, taking or destruction of even one animal from the public lands of the United States, we view it as consonant that the government be able to seek a more severe penalty for the more serious, and potentially more harmful, offense of knowingly converting to private use horses loaned to an individual by the government.[5]

## IV.

■ Hughes next asserts that the district judge improperly instructed the jury with respect to the element of malice contained in Count III. A person violates 16 U.S.C. § 1338(a)(3), the underlying charge, when he "maliciously causes the death or harassment of any wild free-roaming horse or burro." *Id.* Hughes observes that a recent regulation defined "malicious harassment" of wild horses as "any intentional act which demonstrates a deliberate disregard for the well-being of wild free-roaming horses," 43 C.F.R. 4700.0–5(k) (1977). Hughes contends that this regulation mandates his proffered instruction, which, unlike the instruction given by the district judge, would require the jury to find that he killed the horses in an inhumane manner. We disagree.

The district judge's instruction, which required a finding that the defendant committed "intentionally a wrongful act toward

---

5. This case is thus distinguished from those cases cited by Hughes in which courts have found that Congress had affirmatively manifested an intent that a general statute not apply to a particular fact situation or that a specific statute be the exclusive remedy for a particular problem. *United States v. Bedore,* 455 F.2d 1109 (9th Cir. 1972); *Kniess v. United States,* 413 F.2d 752 (9th Cir. 1969). *See generally*

*United States v. Jones,* 607 F.2d 269, 272–74 (9th Cir. 1979) Basically the same observations apply to *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), in which the Supreme Court held that a statute making it a separate offense to use a firearm to commit a federal offense was not intended to allow further enhancement of punishment for a conviction of armed robbery.

the animal without justification or excuse," does not differ substantially from Hughes' proposed instruction, and neither instruction is properly read as excluding conviction for the deliberate and unjustified killing of a wild horse merely because the act was performed in a relatively humane manner. Nor is there any legislative history suggesting that only "inhumane" methods of killing were contemplated by the enactment in question. No error or prejudice occurred.

### V.

■ We now address various claims of insufficient evidence to sustain the conviction. The standard for review requires us to view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Mills*, 597 F.2d 693, 696 (9th Cir. 1979).

■ As to Count III, Hughes contends that there was no evidence that he (a) sold "wild free-roaming horses" as defined by the Act; (b) acted with malice; or (c) caused the death of the horses. We disagree. BLM agent Harding stated that the loaned horses came from herds located in management areas in Oregon; and, although Hughes contends that Harding's statement was ambiguous, we think it is fairly read as implicitly stating that these were wild horses from herds managed by the BLM on public lands. Harding's statement, when combined with Hughes' own confession that the horses he sold came from the Adopt-a-Horse program, is sufficient evidence to prove that the horses were wild free-roaming horses.

We have already rejected Hughes' contention that the malice requirement of the Act requires that the killing be inhumane as well as deliberate and wrongful. It is clear that Hughes knew what he was doing and that he did not think that he was justified in selling the horses for slaughter; these were healthy animals, not sick or injured animals who were humanely killed to save further misery.

There was also substantial evidence that Hughes caused the death of these animals.

Hughes first asserts that he cannot be held accountable for any deaths that resulted from his acts. The evidence showed that Hughes sold approximately 100 horses to buyer Terrill, knowing that he was buying them for slaughter. On the basis of *United States v. Levine*, 457 F.2d 1186 (10th Cir. 1972), Hughes incorrectly asserts that he cannot be held responsible for the death of the horses unless Terrill was acting as his agent. To the contrary, *Levine* upheld the conviction of inmates in a federal penitentiary for "causing" interstate travel with intent to carry on unlawful activity involving narcotics. *Id.* at 1188. The Tenth Circuit stated that "cause" means " 'a principal acting through an agent *or* one who procures or brings about the commission of a crime.' " *Id.* (emphasis added) (quoting *United States v. Inciso*, 292 F.2d 374, 378 (7th Cir.), *cert. denied*, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961)). There was no evidence in *Levine* that those who actually traveled in interstate commerce were "agents" of the defendants in the case. *See also United States v. Leggett*, 269 F.2d 35 (7th Cir.), *cert. denied*, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 156 (1959) (upholding conviction for "causing" transportation of stolen automobile across a state line although driver was not defendant's agent, but an automobile salesman dealing with defendant at arm's length).

Hughes also contends that the evidence was insufficient to show that the horses were actually slaughtered. Terrill testified that he shipped them to a slaughterhouse, and Hughes' counsel conceded in closing argument that "there is no dispute that some of these horses were slaughtered . . . ." Hughes' counsel also suggested in closing argument that perhaps some of the horses were not slaughtered, but he cited nothing in the evidence before the court to suggest that conclusion. There was substantial evidence to prove that the horses were slaughtered.

As to Count IV, we exercise our discretion under the concurrent sentence doctrine in declining to review Hughes' contention that he should not have been convicted for

permitting the remains of the horses to be processed into commercial products. *United States v. Young Buffalo*, 591 F.2d 506, 513 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979).

## VI.

Finally, Hughes claims that the district judge refused to give an instruction on his theory of the case. His theory of defense was that BLM agents had authorized him to sell the horses.

The controlling law in the Ninth Circuit states:

> While it is clear that the trial judge must instruct the jury as to the defendant's theory of the case, the instructions given need not be in the precise language requested by the defendant. The refusal to give a requested instruction is not error "if the charge as a whole adequately covers the theory of the defense."

*United States v. Kaplan*, 554 F.2d 958, 968 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977) (citations omitted). In *United States v. Lee*, 589 F.2d 980 (9th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979), *Kaplan* was followed in a case with facts analogous to those here. In *Lee*, the court refused a specific instruction explaining the defendant's theory, that because he was a CIA agent authorized to sell secrets he could not be guilty of spying. We affirmed the conviction, holding that the instructions given were adequate to cover Lee's defense. We reasoned that if the jury had believed that Lee delivered the information as part of his CIA employment, "then they could not have found that he had the necessary intent as explained in the court's instructions." *Id.* at 985.

The facts of this case are substantially the same as *Lee*. If the jury had believed that Hughes had the authorization of the BLM to sell the horses, as his counsel argued before the jury in closing argument, they could not have found the intent necessary to support the conviction. Hughes had the opportunity to have his defense considered by the jury under the instructions given by the district judge.

AFFIRMED.