### UNITED STATES of America, Plaintiff-Appellee,

v.

### Mark FELSEN, Defendant-Appellant.

### No. 79–1519.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Nov. 18, 1980.

Decided May 5, 1981.

Rehearing Denied June 3, 1981.

Alex Stephen Keller of Keller, Dunievitz & Johnson, Denver, Colo., for defendant-appellant.

Nancy E. Rice, Asst. U. S. Atty., Denver, Colo. (Joseph Dolan, U. S. Atty., Denver, Colo., with her, on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and BARRETT and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Defendant Mark Felsen was tried on four counts of importing Ferrari automobiles by false statements in violation of 18 U.S.C. § 542. The jury acquitted on Counts II and IV and convicted on Counts I and III, a conviction that Felsen now appeals. We affirm.

Felsen was the president and manager of Ferrari Denver, Ltd., a Colorado dealership engaged in importing Ferraris for resale in this country. In February 1978, Felsen imported a 1977 Ferrari Berlinetta Boxer 512 (BB512), Vehicle Identification Number (VIN) 23091. He bought the BB512 from a seller in Belgium, having previously arranged to resell it to a buyer in Texas. Count I of the indictment charges that Felsen lied about this Ferrari both on Customs entry documents and verbally to Customs officials at the port of entry. Specifically, although he stated the VIN correctly, he misdesignated the BB512 model as a model 308GTB and falsely stated the Ferrari was covered by a Certificate of Conformity from the U. S. Environmental Protection Agency (EPA) as required by 19 C.F.R. § 12.73. The EPA issues these certificates to automobile manufacturers for models that comply with certain environmental standards. *See generally* 40 C.F.R. § 86. In 1977, the EPA had issued Certificates of

Conformity only for the Ferrari 308GTB and 308GTS models, and the Dino 308GT4 2 + 2 model. At all times pertinent to this lawsuit, the BB512 was not covered by an EPA Certificate of Conformity. The Ferrari manufacturer apparently believed that it was economically impracticable to bring the BB512 into compliance with EPA emission standards.

In April 1978, Felsen imported from the same Belgium seller another 1977 Ferrari, this one a 400 Automatic with VIN 23557. Count III charges that Felsen lied to Customs about this Ferrari as well. First, he called the 400 Automatic a "GT4 2 + 2," a model nonexistent as such. Second, he falsely stated that it was covered by an EPA Certificate of Conformity and that it could be conformed to Department of Transportation (DOT) standards by modifying the automobile with "readily attachable equipment items." 19 C.F.R. § 12.-80(b)(2)(iv) (1978). Like the BB512, the 400 Automatic has never been covered by an EPA Certificate of Conformity. To achieve DOT compliance would require a retrofit operation of roughly 2½ to 3 working days, assuming the parts for a 400 Automatic were available in this country.

Felsen challenges his conviction on four grounds:

(1) The trial court erred in denying his motion for judgment of acquittal based upon the Government's failure to prove the mental state element of the crime in 18 U.S.C. § 542.

(2) The trial court erred in its jury instruction on the scienter requirement of 18 U.S.C. § 542.

(3) The term "readily attachable equipment items" in 19 C.F.R. § 12.80(b)(2)(iv) (1978), dealing with DOT standards, is impermissibly vague.

(4) Prosecutorial misconduct in the cross-examination of Felsen was sufficiently prejudicial to warrant a new trial.

These contentions are meritless.

## I.

### *Denial of judgment of acquittal*

To test the trial court's denial of Felsen's acquittal motion, we must view the evidence most favorably to the verdict and determine whether such evidence was sufficient for a reasonable jury to infer guilt beyond a reasonable doubt. *See United States v. Walton*, 552 F.2d 1354, 1366–67 (10th Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). Our review of the evidence establishes that the trial court's refusal to grant acquittal was not error.

18 U.S.C. § 542 prohibits the importation of goods by false statements. It reads in pertinent part:

"Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, . . .

" . . .

"Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both . . . ."

*Id.*

In essence, Felsen's defense at trial was that he lacked the requisite mental state to commit any crime. He testified that by agreement his Belgium seller was to take charge over achieving EPA compliance for both Ferraris, while he retained the burden of DOT compliance. Felsen was surprised, so he testified, to learn that no EPA Certificate of Conformity covered either the BB512 or the 400 Automatic. Regarding what it would take to achieve DOT compliance for the 400 Automatic, Felsen assertedly believed that the necessary retrofit operation amounted to no more than "readily attach[ing] equipment items" onto the automobile, as permitted by 19 C.F.R. § 12.80(b)(2)(iv) (1978).

The Government, however, introduced ample evidence from which the jury could

have concluded Felsen had willfully [1] made false statements in importing the 1977 BB512 and 400 Automatic. Felsen had several years' experience as both a Ferrari dealer and mechanic. Due to this experience, Felsen had little difficulty in telling Ferrari models apart or spotting the difference between an 8-cylinder and a 12-cylinder engine. Felsen knew, for example, that a model 308GTB had an 8-cylinder engine and a cost of roughly $24,000 and that the BB512 model had a 12-cylinder engine and a cost of $40,000. The Ferrari imported in February 1978 was listed in the Customs entry documents as having a VIN of 23091 and a cost of $40,000. Felsen expressly told the Customs broker who prepared the entry documents that the correct model for that Ferrari was 308GTB, and that is how the documents were made to read. Felsen also knew that although the EPA Certificate of Conformity he supplied to the Customs broker covered the 308GTB, it did not cover the BB512. But from his negotiations with the Belgium seller before the Ferrari entered this country, Felsen knew the VIN 23091 actually belonged to a BB512. He had contracted with the Texas buyer to sell him a Ferrari BB512, VIN 23091. In attempting to finance his purchase and resale of the Ferrari, Felsen submitted to his bank a letter of credit from the Texas buyer's bank and a manufacturer's certificate of origin, both of which matched VIN 23091 to a BB512. Even after Felsen had cleared the BB512 through Customs and had delivered it to his Texas buyer, Felsen again called the BB512 a 308GTB when he applied for a motor vehicle title certificate.

From all this, a jury could have inferred beyond a reasonable doubt that as an experienced Ferrari dealer and mechanic Felsen intended all along to purchase and resell a BB512, that he knew the BB512 was not covered by an EPA Certificate of Conformity, and that he deliberately misdesignated it a 308GTB to slip the noncompliant BB512 past Customs.

Regarding what Felsen knew about the 400 Automatic imported in April 1978, the Government's proof showed the following. Like the BB512, Felsen purchased this Ferrari from the same Belgium seller by VIN 23557. This VIN appeared in the Customs entry documents. The model, however, was shown as "GT4 2 + 2." By itself, this designation does not meaningfully point to any single Ferrari model. Something more is needed, like "308GT4 2 + 2" or "365GT4 2 + 2," to make a bona fide Ferrari model out of the characters "GT4 2 + 2." According to expert testimony, all 1977 models having the core characters "GT4 2 + 2" differ significantly from the 400 Automatic, differences that a jury might reasonably infer would be readily discernible to an experienced Ferrari dealer and mechanic such as Felsen.

Regarding EPA compliance, the 400 Automatic stood on equal ground with the BB512. The EPA Certificate of Conformity that Felsen supplied to his Customs broker for inclusion in the entry documents failed to list either. And according to expert testimony, any attempt to modify the 400 Automatic into EPA compliance would involve the same degree of impracticability as the BB512. Nevertheless, during the Customs inspection at the port of entry, Felsen pointed out certain equipment items that purportedly conformed the 400 Automatic to EPA standards. In view of Felsen's expertise as a mechanic, the jury could reasonably infer he was deliberately trying to mislead the Customs inspectors regarding EPA compliance.

With respect to DOT compliance, the Customs Inspector testified he asked Felsen if he had the "readily attachable" parts required by 19 C.F.R. § 12.80, and Felsen said he did. But according to expert testimony no such parts were available for a 400 Automatic in this country. Even assuming they were, DOT compliance would require a significant retrofit operation of 2½ to 3 working days.

1. Although 18 U.S.C. § 542 requires only that the importer be "without reasonable cause to believe the truth" of his statements to Cus-

toms, the Government at trial voluntarily undertook to show Felsen had acted willfully.

There is additional telling evidence that Felsen's false statements about the 400 Automatic in the Customs entry documents were not innocent. The Customs inspection revealed that the automobile decals identifying the Ferrari as a 400 Automatic had been removed and the holes covered. Also, heavy black tape covered the logo "400 Automatic" on the VIN plate, leaving only the VIN numerals visible.

The above evidence, when viewed together and in context, is ample to support a jury finding that rather than being a product of innocent mistake, Felsen's false statements were meant to end-run EPA and DOT regulations in order to slip the 400 Automatic past Customs.

## II.

### *The jury charge*

18 U.S.C. § 542 does not impose strict criminal liability for false statements made when goods are imported into this country. Section 542 requires that the declarant state the falsehood "without reasonable cause to believe" its truth. *Id.* Felsen proffered two jury instructions that tracked this language.[2] The trial court instead charged that the Government had to prove Felsen "knowingly did an act which the law forbids, purposely intending to violate the law." Rec., vol. VI, at 12–13.[3] This was consistent with the "willfulness" burden the Government voluntarily assumed at trial. *See* note 1 *supra*. Felsen claims, however, that the trial judge erred by refusing to give, in haec verba, his "without reasonable cause" instructions. He argues that the statute's language requires the Government to prove a negative, a burden more onerous than proof of a positive, which the "knowingly" charge imposed. As a result, Felsen contends, the Government was impermissibly relieved of a burden that section 542 imposes. This is nonsense. One who states a falsehood knowingly cannot at the same time do so with a reasonable belief of its truth.

Both Felsen and the Government recognize that failure to instruct the jury

---

2. The first says that to establish the offense, the Government had to prove four elements:

"(1) That the Defendant at the time charged did introduce or attempt to introduce into the commerce of the United States the vehicle described in the particular count;

(2) By means of a fraudulent or false invoice, declaration, affidavit, letter, paper or by means of a false statement written or verbal;

(3) That he did these acts wilfully, and

(4) That he did so without reasonable cause to believe the truth of such statements."

Rec., vol. I, at 23.

The second instruction reads in full:

"One of the essential elements that the prosecution must prove beyond a reasonable doubt is that the Defendant acted without reasonable cause to believe the truth of any statement he may have made. If there is a reasonable doubt as to whether or not the Defendant acted without reasonable cause to believe the truth of any statement, then the verdict must be not guilty."

Rec., vol. I, at 24.

3. More fully, the instruction reads:

"The crime charged in this case is a serious crime which requires proof of specific intent before the Defendant can be convicted. Specific intent as the term implies means more than the general intent to commit the act.

"To establish specific intent, the Government must prove that the Defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all of the facts and circumstances surrounding the case.

"An act or failure to act is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

"The word false must be considered with the words knowingly and willfully. As I have said, an act is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

"An act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids, that is to say with bad purpose either to disobey or to disregard the law.

"The word knowingly is added to ensure that no one would be convicted who made or caused to be a statement or representation which was false because of mistake or accident or other innocent reason.

"If you find that the accused did not knowingly and willfully make any false statements or cause any to be made, you should acquit the accused."

Rec., vol. VI, at 12–13.

on a theory of defense, when the evidence supports the theory, is reversible error. *See Speers v. United States*, 387 F.2d 698, 702 (10th Cir. 1967), *cert. denied*, 391 U.S. 956, 88 S.Ct. 1864, 20 L.Ed.2d 871 (1968). And the parties do not dispute the meaning of the statute's elements. *See, e. g., United States v. Rose*, 570 F.2d 1358, 1363 (9th Cir. 1978). The Government argues, and we agree, that the instruction actually given imposed a tougher burden on the Government and was thus harmless error under Fed.R.Crim.P. 52(a). *See United States v. Johnson*, 462 F.2d 423, 427 (3d Cir. 1972) (charge placing additional burden on Government regarding scienter held harmless error), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973); *cf. Lopez v. United States*, 406 F.2d 903, 905 (5th Cir. 1969) (imposing "beyond reasonable doubt" standard where statute required only "preponderance of evidence" standard held harmless error).

## III.

### The term "readily attachable equipment items"

■ Count III of the indictment relates to the 400 Automatic. In addition to falsely designating it as a "GT4 2 + 2" and falsely stating it complied with EPA standards, Felsen submitted DOT Form HS–7. He checked Box 4, thereby declaring that the 400 Automatic did not meet all DOT requirements but that compliance could be achieved by attaching to the auto "readily attachable equipment items." This phrase appears in the Government's bill of particulars as well as in 19 C.F.R. § 12.80(b)(2)(iv) (1978). Section 12.80(a) says no vehicle may be imported into this country unless the importer makes one of several declarations. By checking Box 4 on Form HS–7, Felson made this one:

"The merchandise consists of new vehicles being imported for purposes of resale, and such vehicles do not presently conform to all applicable Federal Motor Vehicle Safety Standards because *readily attachable* equipment items are not attached, but there is affixed to the windshield of each vehicle a label stating the standard with which and the manner in which the vehicle does not conform and that the vehicle will be brought into conformity by attachment of such equipment items before it is offered for sale to the first purchaser for purposes other than resale." (Emphasis added).[4]

After citing hornbook law concerning due process requirements for properly apprising a defendant of the crime charged, *see, e. g., Bouie v. Columbia*, 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964) (statutory language); *United States v. Mersky*, 361 U.S. 431, 440–41, 80 S.Ct. 459, 464, 4 L.Ed.2d 423 (1960) (imposing same definiteness requirements for regulations as for statutes); *United States v. Radetsky*, 535 F.2d 556, 562 (10th Cir.) (language in indictment), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), Felsen argues that the term "readily attachable" fails under the Due Process Clause for vagueness, and that therefore the part of Count III on DOT requirements should have been dismissed. Felsen contends that even though something may not be "readily attachable" to a $5,000 Ford, it may well be considered "readily attachable" to a $40,000 Ferrari. Admittedly, "readily attachable equipment items" is nowhere officially defined or judicially construed, but that does not automatically render the term void for vagueness. In *United States v. National Dairy Products Corp.*, 372 U.S. 29, 33–34, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963), the Supreme Court held that section 3 of the Robinson-Patman

4. 19 C.F.R. § 12.80(b)(2)(iv) (1978) itself says that the importer must declare:
"Such vehicle is a new vehicle being imported for purposes of resale which does not presently conform to all applicable safety standards because readily attachable equipment items are not attached, but that there is affixed to its windshield a label stating the standard with which and the manner in which such vehicle does not conform and that the vehicle will be brought into conformity by attachment of such equipment items before it will be offered for sale to the first purchaser for purposes other than resale . . . ."

Act making it a crime to sell goods at "unreasonably low prices" to destroy or eliminate competition is not unduly vague. The Court said the challenged statutory language must be viewed in context with the conduct sought to be proscribed.

■ Here, the law conditions a vehicle's entry into this country upon its compliance with DOT requirements. *See* 19 C.F.R. § 12.80(a). The "readily attachable" rubric is an exception to avoid requiring hyper-technical compliance. In context, the designation is not impermissibly vague. Reasonably facile compliance is contemplated by a less-than-significant attachment of equipment items to the entering automobile. Thus, for example, it would make little sense to refuse entry to an auto that comes to a port of entry without a required rear-view mirror since the mirror could be readily attached here. Even assuming close cases might arise under the "readily attachable" terminology, Felsen's case is not one of them. Achieving DOT compliance for the 400 Automatic required a significant retrofit operation. The proof showed that if parts were available at all, they were not available in this country. Yet Felsen, who was permitted to freely scrutinize the 400 Automatic during the Customs inspection and thereby to recognize the 400 model, told Customs officials he had the parts required for DOT compliance. Even if parts were available, the labor for the retrofit operation to attach the parts was estimated (by comparison to a related model) at 2½ to 3 working days. From the evidence in this case, the jury could reasonably infer a deliberate effort on Felsen's part to frustrate the purpose of the "readily attachable" exception.

## IV.

### *Prosecutorial misconduct*

■ The thrust of Felsen's defense was that he did not lie to Customs about EPA requirements because he honestly believed his seller in Belgium, a Mr. Jacques Swarters, would take care of EPA compliance as agreed. On direct examination, Felsen testified about the details of this arrangement and about statements allegedly made by Swarters. Swarters was never produced as a witness at trial. However, the Government had a customs agent obtain a sworn statement from Swarters which apparently contradicted Felson. Hampered by Swarters' absence as a witness, the prosecutor decided to use Swarters' sworn statement, as well as the Customs agent's written report of his interview with Swarters, in cross-examining Felsen about statements Felsen had attributed to Swarters. Defense counsel objected to this procedure on the grounds that the Government could not produce Swarters and that the jury would infer the questions were properly based on an official document.

The trial court sustained the objections. At one point, the judge ordered a question by the prosecutor based on Swarters' statement stricken, and admonished the jury to disregard it. In response to defense counsel's objection that the jury could draw improper inferences from the prosecutor's use of the documents, the judge instructed the jury that unless the Government could produce Swarters, it was bound by Felsen's answers. When the same objection was made regarding the Government's use of a statement by another person who did not testify, the trial court stated in front of the jury that the statement did "not mean anything." Rec., vol. V, at 232. At no time did defense counsel move for a mistrial on these grounds or ask for further curative instructions.

On appeal, Felsen argues that the Government's attempted use of the written statements was so prejudicial that the damage could not be cured. We disagree. On this record, we believe any prejudice to defendant which may have resulted from the procedure was rendered harmless by the court's instructions. *See* Fed.R.Crim.P. 52(a). This is not a case in which the Government was unprepared to prove the facts underlying its cross-examination. *See, e. g., United States v. Brown*, 519 F.2d 1368, 1370 (6th Cir. 1975) (Government conceded the questions had no factual basis). The record supports the inference that the

prosecutor had what she believed to be admissible evidence upon which to base her cross-examination of Felsen, namely Swarters' sworn statement and the customs agent who interviewed him. She was prepared to call the customs agent but the trial court refused to allow him to testify. Once the court made clear outside the hearing of the jury that the statements and the witness' testimony would not be admitted, the prosecutor did not pursue this line of questions further. We find no prosecutorial impropriety necessitating reversal.

Affirmed.